**Don OLENHOUSE, et al., Plaintiffs–Appellants,**

v.

**COMMODITY CREDIT CORPORATION, et al., Defendants–Appellees.**

No. 93–3012.

United States Court of Appeals, Tenth Circuit.

Dec. 20, 1994.

Karen K. McIlvain, McIlvain Law Office, Madison, KS, for plaintiffs-appellants.

Stephen K. Lester, Asst. U.S. Atty. (Jackie N. Williams, U.S. Atty., with him on the brief), Wichita, KS, for defendants-appellees.

Before MOORE, Circuit Judge, LOGAN, Senior Judge, and KANE *, Senior District Judge.

KANE, Senior District Judge.

This extensive review of an administrative agency case decided on appeal by a district court delineates the standards to which the district court must conform. When acting as a court of appeal, it is improper for a district court to use methods and procedures designed for trial. Moreover, the District Court here permitted the use of a so-called "motion to affirm" as well as a motion for summary judgment in contravention of the established law of this circuit.

Because our standard of review is *de novo* and because we have been required to scrutinize the 1600 page administrative record, we decide as well the merits of the appeal rather than remand. We reverse the District Court's affirmance of the agency's decision.

A certified class of Kansas farmers ("Farmers") appeal from the order of the United States District Court for the District of Kansas affirming temporary yield and deficiency payment reductions imposed by the Agriculture Stabilization and Conservation Service (ASCS) under a federal price support program for wheat. Program participants are entitled to deficiency payments when the actual market price for wheat falls below the target price set by the Secretary of Agriculture. Payments may be reduced to reflect a decrease in a farm's expected production, but only if that decrease is the result of causes other than a natural disaster or other condition beyond the producer's control.

Due to disastrous rains that destroyed fall plantings and flooded fields, Appellant–Farmers planted their 1987 program wheat after the fall 1986 planting season. The ASCS deemed the late planting a "changed practice" under program regulations, and reduced the yield per acre for which deficiency payments would be made.

The Farmers claim the ASCS's action was arbitrary and capricious in that it was the product of an inadequate administrative appeals process and not supported by substantial evidence in the administrative record. They argue the ASCS misapplied the rules and regulations governing wheat program payments by failing to consider fall rains and failing to determine whether late planting was the result of conditions beyond the

---

* Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation.

Farmers' control. The Farmers also argue county and state ASCS representatives misled them into believing late planting would not affect program yields. Finally, the Farmers claim the imposed reductions constituted a taking of contractual property rights without due process in violation of the Fifth Amendment of the United States Constitution.

Despite our thorough review of the administrative record, we find it difficult to ascertain exactly *what* the agency did or did not do in this case.[1] The ASCS's initial decision was made by a single individual and was announced by form letter nearly one year after the wheat had been planted. During the course of that year, agency policy regarding the imposition of yield reductions changed numerous times. The basis upon which this individual reduced the Farmers' yields cannot be ascertained; other than finding the Farmers planted their wheat late, the decision is silent as to the rules applied, the factors considered, or the methods used to calculate the reductions. Most significantly, there is no determination by the individual acting on behalf of the agency that late planting was the result of conditions within the Farmers' control.

The Farmers appealed this initial decision to the state ASCS committee and then the Deputy Administrator, State and County Operations (DASCO). They asserted the late planting was due to conditions beyond their control and done in reliance on information they received from ASCS officials indicating late planting would not result in reductions. Throughout the appeal process, the Farmers sought information regarding the basis for the reductions imposed and the way they were calculated.

Without making any findings of fact or articulating a reasoned basis for its decision, DASCO found "no justification" for relief. DASCO summarily concluded the Farmers were not misinformed and found a determination that late planting was not due to conditions beyond the Farmers' control implicit in the ASCS's action because "the county and state [ASCS] committees are familiar with ... weather conditions for [the Farmers'] area." Aplts.' App. at 49–50.

DASCO's extrapolation escaped the scrutiny of the District Court. Instead of reviewing the administrative record itself, the District Court relied on counsel's statements as to what was in the record and material appended to the government's "Motion to Affirm." The District Court selected isolated bits of this second hand "evidence" and concluded the agency's action was supported by the administrative record. Relying on this extrapolation, the District Court interpreted the wheat program regulations to authorize yield reductions notwithstanding the occurrence of a natural disaster, attributing this interpretation to the agency, and affirming the interpretation as the agency's own. *See Olenhouse v. Commodity Credit Corp.*, 807 F.Supp. 688, 692–93 (D.Kan.1992).

While it found the Farmers' arguments regarding misinformation "persuasive" and opined they "may have a stronger basis for their contentions than defendants do," the District Court construed its review powers narrowly and concluded the agency's findings were "plausible" and therefore not "arbitrary and capricious." *Id.* at 690, 693. In doing so, the District Court employed neither the procedure nor the standard of review required when agency action is challenged on appeal to a district court in this circuit.

■ Where questions of due process and sufficiency of the evidence are raised on appeal from an agency's final decision, the district court must review the agency's decision-making process and conduct a plenary review of the facts underlying the challenged action. It must find and identify substantial evidence to support the agency's action and may affirm agency action, if at all, only on the grounds articulated by the agency itself. This cannot be done in the context of a motion to affirm, which allows the agency to

---

1. This point is underscored by the parties' failure to designate the administrative record on appeal. The Farmers included 172 pages of the 1600 page record in their appendix and appellees included none. We supplemented the record on our own to include both the administrative record and the briefs upon which the District Court granted the government's so-called motion to affirm. *See* Orders dated 9/15/94 (Supplemental Record I) and 9/29/94 (Supplemental Record II).

define the issues on claimants' appeal. The District Court's deviations from established procedure doom its review to prejudicial error.

## I. Background

### A. Statutory and Regulatory Scheme

#### 1. Overview

Neither the parties in their briefs, nor the District Court in its opinions below,[2] addressed comprehensively the statutory and regulatory scheme governing the wheat program at issue. Perhaps this is because the patchwork of statutes, public laws, regulations, internal agency guidelines and interpretive rules applicable to United States Department of Agriculture (USDA) price support programs generally, and the wheat program specifically, epitomize bureaucratic muddle. The statutes and regulations alone span hundreds of pages in multiple volumes of the United States Code and Code of Federal Regulations. Programs are administered and funded by different USDA agencies. These agencies rely on internal guidelines and interpretive rules that are revised frequently. Yet we find an understanding of the regulatory scheme essential to an analysis of the issues raised on appeal, so we begin with an overview of the applicable provisions.

The Commodity Credit Corporation Charter Act, enacted in 1948 and codified at 15 U.S.C. § 714 (1988), authorizes the Commodity Credit Corporation (CCC) to support farm prices as determined by the Secretary of the United States Department of Agriculture (USDA). Specific price support programs were enumerated by Congress in the Agricultural Act of 1949, 7 U.S.C. § 1421 et seq., which authorizes the Secretary of the Department of Agriculture to deliver price supports under those programs through the CCC. See 7 U.S.C. § 1421(a) (1988).

The general administration and supervision of price support programs in the field has been delegated by the Secretary to the ASCS. 7 C.F.R. §§ 713.2, 1421.2 (1987)[3] (feed grain, rice, cotton, wheat and related programs). Thus, the CCC holds the purse strings and the ASCS runs the programs. Different sets of regulations govern the conduct of each. Compare 7 C.F.R. §§ 1402–1498 (price support regulations for various grain programs applicable to the CCC) with 7 C.F.R. §§ 700–799 (regulations governing feed grain, rice, cotton, and wheat programs applicable to the ASCS).

The ASCS administers price support programs through a network of committees. These committees, and the conduct of the ASCS under all USDA programs, are governed not only by the Agricultural Act of 1949, the CCC Charter Act, and their respective regulatory schemes, but also by the Soil Conservation and Domestic Allotment Act of 1935. 16 U.S.C. § 590h(b) (1988 & Supp. 1994) (incorporated by reference and made part of the Agricultural Adjustment Act of 1938 and later amended by the Food Security Act of 1985, Pub.L. 99–198, §§ 1711, 1712 (1985)); see Garvey v. Freeman, 397 F.2d 600, 604 n. 2 (10th Cir.1968).

Three levels of authority exist under the ASCS committee structure. See generally, 16 U.S.C. § 590h(b) (fifth undesignated paragraph) (as amended) (function and election requirements); 7 C.F.R. §§ 7.1 (selection and functions, generally), 713.2 (grain programs, administration), 1421.2 (grain programs, CCC financing). At the local and state levels, USDA programs are administered by local, county and state ASCS committees. 16 U.S.C. § 590h(b). Local committee members are elected by and from farmers within an administrative area who participate or cooperate in price support programs administered in the area. Id. Mem-

---

**2.** The District Court issued two opinions in this case: Olenhouse et al. v. Commodity Credit Corp. et al., 136 F.R.D. 672 (D.Kan.1991) (Theis, J.) (denying defendants' motion to dismiss for lack of subject matter jurisdiction and granting plaintiffs' motion for class certification); and Olenhouse et al. v. Commodity Credit Corp. et al., 807 F.Supp. 688 (D.Kan.1992) (Kelly, J.) (denying plaintiffs' motion for summary judgment and

granting defendants' motion to affirm agency decision). The latter decision is the subject of this appeal.

**3.** All cites to the C.F.R. refer to the 1987 edition applicable here unless otherwise indicated. In 1989, C.F.R. chapter 7, part 713 was redesignated and now appears at 7 C.F.R. § 1413 (1994).

bers of the local committees nominate and elect a county committee of three farmers who reside in the county. *Id.* Members of the state committee, who must also be farmers, are appointed by the Secretary. *Id.* At the federal level, ASCS's Deputy Administrator for State and County Operations (DASCO) supervises state committees. 7 C.F.R. § 7.1. Decisions of the Deputy Administrator constitute final agency action and are subject only to judicial review. 7 C.F.R. § 7.33.

The ASCS committee system established by the Soil Conservation Act contemplates that local and county ASCS committees serve as liaisons between the Secretary and individual producers. 16 U.S.C. § 590h(b). The Act specifically requires the Secretary to ensure information concerning changes in federal laws and agricultural programs is communicated in a timely manner to local committees in areas that contain agricultural producers who might be affected by such changes. *Id.*

## 2. *The Wheat Program*

Each member of the appellant class of Farmers participated in the 1987 Price Support and Adjustment Program for wheat (the "Wheat Program"). The Wheat Program is authorized by Section 107D(c) of the Agriculture Act of 1949, 7 U.S.C. § 1445b–3 (1988) (as amended by the Food Security Act of 1985, codified in applicable part at 7 U.S.C. § 1308 (1988) and the Farm Disaster Assistance Act of 1987, codified at 7 U.S.C. § 1445b–3(c)(2)(A)). The Wheat Program balances the goals of farm acreage reduction and price support for farmers.

In advance of the planting season, the Secretary announces a level of price support (a "target" price) for wheat. 7 U.S.C. § 1426(a); 7 C.F.R. § 713.108(a). Farmers plant their wheat, and apply for entry into the program. Once their application is approved and the contract with the CCC signed, participating farmers are guaranteed the target price for their crop; if the ultimate market price falls below that price, farmers are entitled to "deficiency payments" to make up the difference. *See* 7 U.S.C. § 1445b–3(c); 7 C.F.R. § 713.108(a), (c). Because a farm's established yield[4] and the target price for wheat are established at the time a farmer's request to participate in the program is approved (*see* 7 U.S.C. § 1426(a)), farmers can estimate their deficiency payment—and under certain circumstances, obtain a percentage of it as an advance[5]— before their crop is harvested. *See* 7 U.S.C. § 1445b–2; 7 C.F.R. § 713.104. Farmers rely on these projections and advances to cover operating costs, secure loans and manage cash flow. These programs, and the payments guaranteed under them, thus have become an integral part of the modern farm operation.

Participants' entitlement to payment under the program is not without qualification, however. Participation is contingent upon signing a contract with the CCC. 7 C.F.R. §§ 1421.5 (contract precondition of eligibility under CCC price support programs for grain), 713.50 (contracting procedures under Wheat Program). The contract requires farmers to follow established farming practices and plant their crops in a workmanlike manner. Except as provided in parts 790 and 791 of the Code,[6] failure to comply fully

---

**4.** This yield, or "farm program payment yield," is a projection of the number of bushels per acre a particular farmer can be expected to harvest under normal conditions using established farming practices. In 1987, the "program payment yield" for a particular farm was the average of its yields for the 1981 through 1985 crop years, excluding the year the yield was highest and the year the yield was lowest. *See* 7 C.F.R. § 713.6(a).

**5.** Participants in programs with established acreage limitations may be eligible to receive up to 50% of their anticipated deficiency payments in advance. *See* 7 U.S.C. § 1445b–2; 7 C.F.R.

§ 713.104. Participants in the 1987 Wheat Program apparently qualified for advance payments, as several Farmers received them. *E.g.*, Admin.R. at 1503 (Don Olenhouse).

**6.** DASCO retains equitable power under the regulations to authorize payment of benefits notwithstanding a producer's failure to comply fully with the terms of the contract or applicable regulations. 7 C.F.R. § 791.2. Producers who made "good faith effort[s] to comply" and "rendered substantial performance" may apply to their county ASCS committee for consideration under this provision. *Id.*

with either the terms of the contract or the regulations in part 713 may render a participant ineligible for benefits, *see* 7 C.F.R. § 713.103(b), or eligible only for reduced benefits. *See* 7 C.F.R. § 713.6(c)(1) (deficiency payments can be reduced to reflect lower-expected yields if the decrease is the result of a change in farming practice or other condition within the producer's control).

It is the manner in which the ASCS determined Appellant–Farmers had failed to comply with program regulations and its imposition of reduced benefits under 7 C.F.R. § 713.6 that forms the basis of this appeal.

### 3. *The role of the county committee*

Due to the number of farmers nationwide and the diversity of their operations, the Secretary places "enormous reliance" on the decisions of 3,000 local and county committees, which represent the agency at the "root line" of the nation's 2,000,000 farmers. *See Esch v. Lyng,* 665 F.Supp. 6, 21 (D.D.C.1987) (quoting testimony of DASCO chief Thomas VonGarlem), *aff'd sub nom Esch v. Yeutter,* 876 F.2d 976 (D.C.Cir.1989). With respect to the Wheat Program, it is the county committee that determines participants' "farm program acreage" and "program payment yields," [7] assesses compliance with program requirements,[8] calculates deficiency payments,[9] determines what constitutes "changed practices" caused by "conditions beyond the producer's control," [10] and imposes reductions.[11]

This is no small task. The process is highly regulated and requires the county committee to apply a panoply of regulations and internal interpretive rules,[12] conduct on-site investigations of farming operations,[13] and review and determine variances in eligible acreage or payment yields.[14] While these "farmer-commissioners" sit informally, "appraising and assessing the relative rights of their neighbors and themselves in the administration of a program by and for farmers," they wield significant power and shoulder the burden of knowing and implementing a complex statutory and regulatory scheme. *Garvey,* 397 F.2d at 612 (10th Cir.1968).

County committees are guided in their application of program regulations by an ASCS Handbook distributed by the Secretary to individual state committees, which then make the Handbook available to local county committees. ASCS Handbook 5–PA (Rev. 7) (the "Handbook"). The Handbook is an internal reference for use by the state and county committees; it is not distributed to program participants generally. *See Jones v. Espy,* 1993 WL 102641 (D.D.C.1993) (not reported in F.Supp.) (discussing ASCS Handbook 5–CM, price support program financing). Where instructions in the Handbook conflict with regulations, the regulations control. *Id.* (citing 7 C.F.R. § 713.2(b), (c)).

Based on our review of the Handbook sections provided us on appeal,[15] the instructions applicable to the 1987 Wheat Program were revised several times between the time the Farmers planted their wheat (January–March 1987) and the time they were notified yield reductions had been imposed (December 1987). For example, ¶ 414 regarding the imposition of yield reductions was revised at

---

**7.** *E.g.,* 7 C.F.R. §§ 713.3(*l*)–(m), 713.4, 713.12.

**8.** *E.g.,* 7 C.F.R. §§ 713.50–713.53, 713.103, 713.108, 713.6.

**9.** 7 C.F.R. § 713.108.

**10.** 7 C.F.R. §§ 713.6 (for the purpose of determining yield reductions), 713.105 (for the purpose of determining disaster credit).

**11.** 7 C.F.R. §§ 713.6(c) (yield reductions), 713.108(c) (deficiency payment reductions).

**12.** In determining acreage bases, for example, the county committee must apply requirements set forth at 7 U.S.C. §§ 1445b–3(c) and 1465, as well as those set out in 7 C.F.R. §§ 704, 713 and 718. 7 C.F.R. § 713.4.

**13.** *See, e.g.,* 7 C.F.R. § 718.6(b) (compliance audits).

**14.** *See, e.g.,* 7 C.F.R. §§ 713.6 (county committee may reduce payment yields), 713.4, .12 (committee may reduce or increase amount of acreage eligible for program benefits), 718.6 (same).

**15.** The record is limited to three pages of instructions related to ¶ 414 of the Handbook, and three related interpretive "PA Notices." Aplts.' App. 192–93; Aplees.' Supp.App. at 33–42.

least twice. *See* Aplees.' Supp.App. at 33–36 (page 329, related to ¶ 414(A), is dated 8–26–86; ` ` pages 330 and 331–32, related to ¶ 414(B), are dated 12–3–87 and 1–12–88, respectively). Paragraph 414(B) was also the subject of at least three interpretive notices issued by the Secretary during that period of time, each of which revised agency policy regarding the imposition of yield reductions. *Id.* at 37–42 (Notice PA–1112 regarding "changed practices" precipitated by fall 1986 weather conditions, dated 1–9–87; superseded by Notice PA–1129, dated 3–20–87; superseded by Notice PA–1189 reinstating previous procedure, dated 11–19–87).

The effect these changes had on the agency's decision to impose the yield and deficiency payment reductions at issue is unclear. What is clear, however, is at the time the Farmers were faced with the decision of whether to plant or not plant 1987 program wheat, internal ASCS policy regarding the effect of fall flooding was unsettled.

### B. *Facts* [16]

█ The Farmers reside in rural areas of Wilson County, Kansas. In September 1986, intending to participate in the 1987 Wheat Program, class representatives Don Olenhouse and Alan Sharp planted hard winter wheat on farms they operate. Admin.R. at 585–86 (Olenhouse testimony before state ASCS committee), 650 (Sharp testimony before state ASCS committee). In September and October 1986 Wilson County received over 20 inches of rain and was declared a disaster area. Aplts.' Br. at 5; *see* Admin.R. at 586. The wheat planted by Olenhouse and Sharp was destroyed. Admin.R. at 586, 650.

Olenhouse was able in late November to replant some of the fields washed away by the rains; he completed his replanting in all but a few "mudholes" by January 1, 1987. *Id.* at 586–98; Certain of Sharp's fields were dry enough to replant in December, 1986. *Id.* at 650. Most, however, were not. *Id.* By late December and early January, there was considerable confusion regarding the effect delayed planting might have on payments under the 1987 Wheat Program. The Farmers were aware winter wheat is generally planted in the fall, but the rains made this an impossibility.,

Concerned local farmers might "go broke" if they were unable to plant their program wheat, members of the county committee called a special meeting with state officials in Topeka. *See, e.g.*, Admin.R. at 621–22 (testimony of county committee member and Appellant–Farmer Bob Olson). Olson under-stood the result of that January 13, 1987 meeting to be approval for late planting, as long as program wheat was planted in a workmanlike manner. *Id.* at 622.

Relying on the county committee and information received at the Topeka meeting, the Farmers planted their wheat. *See, e.g.*, Admin.R. at 735, 743, 777 (Farmer letters). They bought seed and fertilizer, kept 27.5% of their otherwise arable acreage fallow as required under the program, and complied with the rest of the program rules and regulations. *Id.; see id.* at 597–98 (Olenhouse testimony). In March and April, the Farmers' applications to participate in the Wheat Program were approved by the ASCS Executive Director for Wilson County. Admin.R. at 1474, 1483–90, 1500–40, 1544–59, 1565–66, 1569–78 (CCC Contracts for Participation in Price Support Program, Form 447).

---

16. Because we are obligated to undertake an *independent review of the agency's action in this appeal, see Thomas Brooks Chartered v. Burnett,* 920 F.2d 634 (10th Cir.1990), we are not bound by the District Court's recitation of the facts below. *See Olenhouse v. Commodity Credit Corp.,* 807 F.Supp. 688 (D.Kan.1992). We state at the outset, however, that our efforts are hampered by the less than coherent manner in which the facts have been gathered and presented. The Farmers, for example, support many of their factual assertions with the simple parenthetical "admitted in answer." *See, e.g.,* Aplts.' Br. at 8–12, 14–15. Not only have the Farmers neglected to

provide us with a copy of the agency's answer, they concede elsewhere the government actually denied the "facts" asserted but because the record "provides no basis" for the denials, the Farmers would set the facts forth as uncontroverted. *See* Supp.R. II (Mem.Supp.Pls.' Mot. Summ.J. at 2). The Farmers also fail to provide citation to the record for many of their factual assertions. Citations that are provided often fail to support the assertions made.

Although the government fares better in this regard, it also fails to support factual assertions with references to the record, and often overreaches when it does.

Many Farmers, including class representative Olenhouse, certified their wheat acres under the program and received advance deficiency payments. Admin.R. at 1500–55, 1503 (Olenhouse). When their wheat showed signs of moisture-related damage from continued rain in the area, Olenhouse, among others, applied for and received full federal disaster credit under the program. *Id.* at 1313–1318, 1330–1332, 1402–1449, 1491–1499 (CCC Form 574 requests). Neither the advance deficiency payments nor the disaster credits reflected any reduction for late planting. To the contrary, both were commensurate with full program benefits.

Wheat is not considered a profitable crop without deficiency payments. *See* Admin.R. at 595 (Olenhouse testimony). Olenhouse testified he would never have incurred the expense of planting wheat and keeping acreage idle that otherwise could have been planted to more profitable crops such as soybeans, had he been told deficiency payments would be reduced. *Id.* at 595–97.

While county officials were approving the Farmers' applications to participate in the Wheat Program and authorizing full benefits under it, federal and state officials were reviewing and revising ASCS internal policy regarding the imposition of temporary yield reductions for late planting. On January 9, 1987, DASCO distributed Notice PA–1112, which purportedly notified state and county [17] ASCS committees that spring seeding may be considered a changed practice for the purpose of temporary yield reductions. *See* Aplees.' Supp.App. at 37–38. On March 20, 1987, DASCO superseded PA–1112 with PA–1129, which notified committees that changed practices may occur only on part of a farm's planted acreage, and instructed them to calculate temporary yield reductions accordingly. *Id.* at 39. Paragraph 414(B) of the ASCS Handbook regarding yield reductions was revised to reflect these changes in December 1987. Aplts.' App. at 193. This was only days before the Farmers received notice program yields had been reduced.

On May 27, 1987, after the Farmers had planted their wheat, Congress enacted the Farm Disaster Assistance Act of 1987, Public Law 100–45, codified at 7 U.S.C. § 1445b–3(c)(2)(A)(i). This statute permitted Wheat Program participants who did not attempt to replant wheat destroyed in the fall to obtain 33⅓% of their full deficiency payments. The Farmers could not benefit from this Act. Instead, they continued to comply with program regulations and harvested what wheat they could. Of the wheat planted in Wilson County during the 1986–87 season, only that planted in January was harvested. Admin.R. at 591 (Olenhouse testimony).

At some time before December 1987, the Wilson County Committee was disbanded. The State Committee directed Lloyd Johnston to impose temporary reductions on the Farmers' 1987 wheat yields pursuant to a policy implemented by the State Committee "because the Wilson COC failed to establish a reasonable policy as required by 5–PA (Rev. 7), paragraph 414." Admin.R. at 39 (letter from State Executive Director Frank Mosier to Southwest Region Director transmitting the Farmers' case files); *see id.* at 491–92 (Mosier statements at state committee hearing). Johnston announced the reduction in form letters dated December 30, 1987, which he signed as Acting County Executive Director. Admin.R. at 783–945.

The form letters advised the Farmers reductions were being imposed because agency "records indicate (some or all) of the wheat planted on the farm was seeded in (January, February, or March)." *See, e.g.,* Admin.R. at 888 (Olenhouse letter). Johnston stated the revised yields "represent[ ] the production which [sic] normally could be expected for wheat planted during this period if it was [sic] actually carried to harvest." *Id.* The reductions imposed were as follows: Winter wheat planted in January and February reduced 20% and 35% respectively; winter wheat planted in March reduced 100%; spring wheat planted in March reduced 30%; and spring wheat planted after March re-

---

17. Although the directive on the face of the Notice requires state committees to distribute it to county committees, Wilson County Committee member and Appellant–Farmer Bob Olson testified the first notice he received was in April 1987, after he and other Appellant–Farmers had planted their wheat. Admin.R. at 623.

duced 100%. Admin.R. at 39. Johnston's letters to the Farmers did not mention the supervening state committee policy or the basis for the reductions imposed.

### C. *Appeals Process*

The Farmers appealed the yield reductions to the state ASCS committee. After a series of informal hearings conducted in February 1988, the state committee generally denied the Farmers' requests for relief. Admin.R. at 1, 237–294 (letters denying Farmers' appeals).[18] The committee stated it had considered comments made at the informal hearings and "information received from the Wilson County ASCS Office," and concluded no relief could be granted because the yield reduction "is in accordance with previously established policy and program provisions." *E.g.,* Admin.R. at 272 (Olenhouse appeal). The "previously established policy and program provisions" are not identified or described in the letters. *Id.*

The Farmers then sought review by DASCO. Certain of the Farmers, including Olenhouse and Sharp, participated in an informal telephone hearing before a hearing officer on May 18, 1988. *See* Admin.R. 5–37 (hearing transcript). DASCO rejected the Farmers' contentions and upheld the state committee's action in a two-page letter dated June 10, 1988. Aplts.' App. at 49–50. This letter constituted final agency action under program regulations.

After summarizing the Lloyd Johnston and state ASCS committee letters and the Farmers' contentions on appeal, DASCO concluded as follows:

"In our review of your clients' entire case files, including the information provided during the informal telephone hearing, we could find no justification to grant relief. Our review indicates your clients were not misinformed by county office personnel regarding payment yields. The county and state committees are familiar with both

normal cultural practices and weather conditions for your area. We have determined both committees used and followed the correct procedures when your clients' yields were reduced. Therefore, your clients' appeal is denied."

Aplts.' App. at 50.

### II. *Appellate Jurisdiction— Notice of Appeal*

■ We first address the sufficiency of the Notice of Appeal filed by the Farmers under Fed.R.App.P. 3(c). As interpreted by the United States Supreme Court, Rule 3(c) requires all parties taking an appeal be named individually in the notice so the appellee and the court can determine "with certitude" which parties would be bound by an adverse judgment or held liable for costs or sanctions. *See Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 318, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988). Formal identification is a "jurisdictional prerequisite," requiring dismissal of parties not specifically named in a notice of appeal. *Id.*

■ The issue arose in this case because the phrase "et al." was used to identify the plaintiff class of farmers in the caption of the original Notice of Appeal filed January 7, 1993, and singular "plaintiff's" was used in the body. In a show cause order dated January 29, 1993, the clerk's office advised counsel the Court was considering summary dismissal of the appeal for failure to comply with Rule 3(c), and requested briefing on the issue. Plaintiffs filed a first amended notice of appeal on February 2, 1993, naming Don Olenhouse, Alan Sharp, and John Rubow as plaintiffs "on behalf of themselves and all others similarly situated," (Aplts.' App. at 44–45), and filed a second amended notice of appeal on February 8, 1993, identifying the class as certified in the District Court below. Aplts.' App. at 46–47. We reserved judgment on the jurisdictional issue raised in the

---

18. The State Committee revised the 100% reductions for winter wheat planted in March and spring wheat planted in April to 62.5% reductions recognizing those producers "act[ed] on information that a payment would be received if wheat were planted and ... compl[ied] with the [Acreage Reduction Requirement of 27.5%] for

the 1987 wheat program." Admin.R. at 480 (excerpts of State Committee meeting minutes related to Wilson County appeals). It also determined where yield reductions were less than 10% of the established yield, the reduction would be disregarded.

show cause order, and now conclude the original notice was sufficient.

The Farmers were certified as a class in the District Court with Don Olenhouse, Alan Sharp and John Rubow designated as class representatives. *See Olenhouse v. Commodity Credit Corp.,* 136 F.R.D. 672 (D.Kan1991) (Aplts.' App. at 25–26). Where the phrase "et al." is used to identify members of a certified class, this Court has implicitly recognized an exception to the *Torres* rule. *See Battle v. Anderson,* 970 F.2d 716, 719 n. 4 (10th Cir.1992) (dicta) (citing *Rendon v. AT & T Technologies,* 883 F.2d 388 (5th Cir. 1989)).

In *Rendon,* plaintiffs' notice of appeal designated "Gilbert Rendon, et al." as appellants and defendant sought to dismiss the appeal. The Fifth Circuit rejected the defendant's *Torres* contention that the term "et al." provided insufficient notice of who was seeking the appeal because Rendon was a designated representative of a class that had been certified in the case from which the appeal was taken. 883 F.2d at 398 n. 8. Because Rendon's actions bound the entire class, the Fifth Circuit held the phrase "et al." sufficient to identify the entire class as appellants. *Id.*

While we discourage use of the phrase "et al." to identify any group of appellants,[19] we agree where a class has been certified, the phrase provides sufficient notice of who is taking the appeal to satisfy the requirements of Fed.R.App.P. 3(c). The rationale for a class exception to *Torres* is even more apparent where, as here, the naming of each class member is an impossibility because the precise number and individual identities are unknown.[20] We conclude the original notice naming "Don Olenhouse, et al." in the caption is sufficient to notify CCC of the parties taking the present appeal. We therefore

have jurisdiction to consider this appeal and address the merits of the Farmers' contentions below.

### III. *Standard of Review*

The Farmers seek review of final ASCS action under the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA"). Specifically, they assert (1) the yield and deficiency payment reductions imposed are unsupported by the record; (2) the ASCS failed to comply with the laws, regulations and agency policy provisions governing the Wheat Program, including regulations governing the administrative appeals process; (3) the method for calculating the reductions imposed was arbitrary and capricious; and (4) by offsetting the Farmers' wheat deficiency payments before they had an opportunity to be heard, ASCS violated the Farmers' rights under the 5th Amendment of the United States Constitution.

### A. *Statutory Limitations on Review*

Section 701 of the APA provides that agency action is subject to judicial review except where there is a statutory prohibition on review or where agency action is committed to agency discretion as a matter of law. 5 U.S.C. § 701(a)(1), (2), *construed in Thomas Brooks Chartered v. Burnett,* 920 F.2d 634, 641–42 (10th Cir.1990). The latter provision is not at issue here. There are, however, two statutory provisions applicable to the Wheat Program that purport to limit judicial review: 7 U.S.C. § 1385 and 7 U.S.C. § 1429.

Neither party addresses these statutes in their briefs, but we must consider them before reaching the merits of the Farmers' contentions on appeal.[21] We spe-

---

**19.** The preferred means of identifying a class of appellants is by naming a designated member "as representative of the class." This practice is specifically endorsed in the recently amended version of Rule 3(c), effective in appeals filed after December 1, 1993. Fed.R.App.P. 3(c) ("[i]n a class action ... it is sufficient for the notice to name one person qualified to bring the appeal as representative of the class").

**20.** It appears only the ASCS has this information. (Aplts.' App. at 20.) In certifying the plaintiff class of individual wheat producers ag-

grieved by the ASCS's 1988 yield reductions, the District Court estimated their number to be "at least 50" but commented the precise number could not be ascertained because plaintiffs had no access to the information, which was held by the ASCS. *Olenhouse,* 136 F.R.D. at 679.

**21.** *See Thomas Brooks,* 920 F.2d at 641–42 (citing *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985) (before any review under § 706 may be had, a party must first clear the hurdle of § 701(a)).

cifically hold §§ 1385 and 1429 do not limit our review in this case. *See Garvey v. Freeman*, 397 F.2d 600, 605 (10th Cir.1968) (§ 1385 did not preclude review of ASCS's determination of wheat farmer's normal yield).

Section 1385 provides:

"[T]he facts constituting the basis for any ... payment under the wheat ... program[ ] authorized by [the Agriculture Act of 1949] ... or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government."

Further, 7 U.S.C. § 1429 provides:

"Determinations made by the Secretary under [the Agriculture Act of 1949] shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act [15 U.S.C. § 714 *et seq.*]."

(Emphasis original).

The essence of the Farmers' claims is the ASCS action violated due process, substantively in the sense of being arbitrary or capricious, and procedurally in the sense of denying minimum safeguards. Neither statute precludes judicial consideration of such claims; rather, consistent with the judicial review provisions of the APA, each prevents the reviewing court from substituting its judgment on the facts for that of the agency. *See Esch v. Lyng*, 665 F.Supp. 6, 12 (D.D.C. 1987), *aff'd sub nom. Esch v. Yeutter*, 876

F.2d 976 (D.C.Cir.1989) (construing § 1385); *Gonzalez v. Freeman*, 334 F.2d 570, 575 (D.C.Cir.1964) (§ 1429). As we stated in *Garvey:*

" 'No legislative language can deprive a man of a fair hearing in the adjudication of his rights, or of his right to have a court decide whether the administrative agency acted within its jurisdiction; and, whether the agency through a lay tribunal applied the correct rule of law to the facts.' "

397 F.2d at 605 (quoting *Caulfield v. Dept. Agriculture*, 293 F.2d 217, 228 (Wisdom, J. dissenting)); *see Sabin v. Butz*, 515 F.2d 1061, 1064–65 (10th Cir.1975).

We conclude neither 7 U.S.C. § 1385 nor § 1429 limits our review of the agency action at issue in the present appeal.

**B. *Overview of Judicial Review Under the APA***

Having determined the ASCS's actions are subject to judicial review, we must determine the appropriate standard. The scope of judicial review of agency action under the APA is set forth in the United States Supreme Court's seminal opinion in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■■■ Judicial review of both formal[22] and informal agency action is governed by § 706 of the APA, which provides that a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found" not to meet six separate standards. *Overton Park*, 401 U.S. at 413, n. 30, 91 S.Ct. at 822, n. 30 (citing 5 U.S.C. § 706(2)).[23] Informal agency action must be

---

**22.** Formal agency action includes action in a case subject to a rulemaking provision of the APA, 5 U.S.C. § 553, based on a public adjudicatory hearing, 5 U.S.C. § 556, 557, or "otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E); *see Overton Park*, 401 U.S. at 414, 91 S.Ct. at 822.

**23.** "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
"(B) contrary to constitutional right, power, privilege, or immunity;
"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
"(D) without observance of procedure required by law;

set aside if it fails to meet statutory, procedural or constitutional requirements or if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 413–14, 91 S.Ct. at 822 (construing § 706(2)(A)–(D), the "generally applicable" standards). Formal agency action must be set aside not only for failing under any of the "generally applicable" standards, but also if the action is unsupported by "substantial evidence" in the hearing record. *Id.* at 414, 91 S.Ct. at 822 (construing § 706(2)(E)). These standards require the reviewing court to engage in a "substantial inquiry." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. An agency's decision is entitled to a presumption of regularity, "but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id.*

 We have held the essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion. *CF & I Steel Corp. v. Economic Dev. Admin.*, 624 F.2d 136, 139 (10th Cir.1980); *American Petroleum Inst. v. EPA*, 540 F.2d 1023, 1029 (10th Cir.1976) (citing *Overton Park*, 401 U.S. at 415–17, 91 S.Ct. at 823–24). Legal principles applicable in the first two determinations are straightforward. Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range. *Overton Park*, 401 U.S. at 415–16, 91 S.Ct. at 823–24. Determination of whether the agency complied with prescribed procedures requires a plena-

ry review of the record and consideration of applicable law. *See id.* at 416–17, 91 S.Ct. at 824. Difficulty arises in connection with judicial review under the "arbitrary or capricious" standard. *See American Petroleum*, 540 F.2d at 1028.

### C. The "Arbitrary or Capricious" Standard

 The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection [24] between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment. *Id.* (citing *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823); *see Sabin v. Butz*, 515 F.2d at 1069 (citing *Overton Park*). Agency action will be set aside

> "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2867.

In a passage particularly relevant in the present case, the Supreme Court cautions,

> "the reviewing court should not attempt itself to make up for such deficiencies; it

"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or "(F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706 (1988).

**24.** This standard should not be confused with the "rational basis" test applied in constitutional challenges to legislation drafted by Congress. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 n. 9, 103 S.Ct. at 2866 n. 9. In *Motor Vehicle Mfrs.*, the Supreme Court stated it does not view the presumption of constitutionality afforded legislation drafted by Congress as equivalent to the presumption of regularity afforded an agency when it acts pursuant to statutory mandate. *Id.*

*may not supply* a reasoned basis for the agency's action that the agency itself has not given."

*Id.* (emphasis added) (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

▮▮▮▮▮ Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.,* 463 U.S. at 50, 103 S.Ct. at 2870. Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. *American Petroleum,* 540 F.2d at 1029 (construing *Motor Vehicle Mfrs.*). The agency must make plain its course of inquiry, its analysis and its reasoning. *Id.* After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles. *Id.* If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action was the product of reasoned decisionmaking, the reviewing court may supplement the record or remand the case to the agency for further proceedings. *Motor Vehicle Mfrs.,* 463 U.S. at 34, 50–57, 103 S.Ct. at 2862, 2870–74; *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see Thomas Brooks,* 920 F.2d at 643–44. It may not simply affirm.

▮▮▮▮▮ In addition to requiring a reasoned basis for agency action, the "arbitrary or capricious" standard requires an agency's action to be supported by the facts in the record. In reviewing the administrative record for factual support, we adopt the analysis articulated by then-Judge Scalia in *Ass'n of Data Processing v. Bd. of Governors,* 745

F.2d 677, 683 (D.C.Cir.1984), and rule informal agency action will be set aside as arbitrary if it is unsupported by "substantial evidence." This is not to substitute the "arbitrary or capricious" standard applicable to informal agency action under § 706(2)(A) with the arguably more stringent standard of review applicable to formal agency action under § 706(2)(E). It is simply an acknowledgment that

> "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense."

*Id.* at 684 (emphasis in original).[25] Evidence is substantial in the APA sense if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Id.* (quoting *Illinois Central R.R. v. Norfolk & Western Ry.,* 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966)).

▮▮▮ The government does not address the "arbitrary or capricious" standard of review. Instead, it asserts the yield and deficiency payment reductions at issue were the result of the ASCS's interpretation of its own regulations, which interpretation is entitled to "substantial deference." Aplees.' Br. at 5–6 (citing *Renfro v. City of Emporia,* 948 F.2d 1529, 1537 (10th Cir.1991), *City of Gillette v. FERC,* 737 F.2d 883, 885 (10th Cir. 1984), *Grynberg v. Watt,* 717 F.2d 1316 (10th Cir.1983), and *City of Aurora v. Hunt,* 749 F.2d 1457, 1462 (10th Cir.1984)). The government misses the point. An agency's interpretation of its own regulations may well be entitled to "substantial deference"; but it nevertheless will be set aside if it is the

---

**25.** Judge Scalia explained that the "scope of review" provisions of § 706(2) are cumulative. *Data Processing,* 745 F.2d at 683 (citing *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823). For example, action supported by substantial evidence under paragraph (E) may nevertheless be an arbitrary and unexplained departure from agency precedent or the result of inferences arbitrarily drawn from the facts found and thus be

reversible under paragraph (A). *Id.* Similarly, in informal agency action where paragraph (E) has no application, paragraph (A) "takes up the slack, so to speak, enabling courts to strike down as arbitrary agency action devoid of needed factual support." *Id.* The "arbitrary or capricious" standard of § 706(2)(A) is thus a catch-all, picking up administrative misconduct not covered by the more specific paragraphs. *Id.*

product of a decisionmaking process deemed arbitrary or capricious, or if it lacks factual support. *See Data Processing,* 745 F.2d at 683–84.

## IV. *Analysis*

### A. *The District Court's Review*

As set forth above, the scope of review under the "arbitrary or capricious" standard is narrow, but it is not without dimension. Under this standard, the District Court was required to review the ASCS's decisionmaking process and determine whether the ASCS examined all relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. at 2866. It was also required to conduct a plenary review of the record to ascertain whether the agency's action was supported by "substantial evidence." *See Ass'n Data Processing,* 745 F.2d at 683–84. We find the District Court failed on both counts.

■■■ With respect to the factual support for the agency's action, we have held the "substantial evidence" test to impose affirmative duties on a district court: the court must consider conflicts in the record and "define, specifically, those facts which it deems supportive of the agency decision if that is the court's resolution of the matter." *Hill v. Morton,* 525 F.2d 327, 328 (10th Cir.1975) (citing *Nickol v. United States,* 501 F.2d 1389, 1391 (10th Cir.1974) and *Heber Valley Milk Co. v. Butz,* 503 F.2d 96 (10th Cir. 1974)); *see Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. This requires a plenary review of the record as it existed before the agency. *Nickol,* 501 F.2d at 1391. The district court may not rely on counsel's statements as to what was in the record; the district court *itself* must examine the administrative record and *itself* must find and identify facts that support the agency's action. *Heber Valley,* 503 F.2d at 98.

Although the District Court's order in the present case provides a synopsis of the contested facts on appeal and purports to find support for facts found by the agency, little of the support came from the administrative record. Instead, it came from counsel's briefs and facts asserted for the first time on appeal. Gaps in the articulation of the agency's reasons for its actions were filled on appeal as well. Illustrative examples follow.

1. *The Agency did not Determine Late Planting was Due to Reasons Within the Farmers' Control.*

■■■ The District Court initially agreed with the Farmers that Wheat Program rules and regulations required the county committee to find "changed practices" and determine the change was due to reasons "within the producers' control" before imposing yield or deficiency payment reductions. *Olenhouse,* 807 F.Supp. at 692. The administrative record, however, was silent as to any such determination. The District Court tried three ways to supply it or otherwise remedy the defect.

First, it speculated the agency had, in fact, made the requisite determination:

> "In this case, the agency found changed practices that called for yield reductions. The agency knew that a disaster had occurred but obviously felt that fact should not alter its findings."

*Id.* at 691.

Next, the District Court supplied the determination itself:

> "In this case, there were changed practices in that farmers do not normally plant wheat in January and February. These changed practices were the farmers' decisions to make.... Although the earlier flooding was not within the control of the producers, the decision to plant late, or at all, was within their control."

Finally, the Court interpreted the ASCS Handbook as having actually done away with the requirement:

> "[P]laintiffs argue that you [sic] cannot reduce for conditions that are a direct result of a disaster. Plaintiffs arguably misread ¶ 414 of the ASCS Handbook. Paragraph 414 only states that the agency is required to determine whether any of the low production is a result of the disaster. The agency can determine that the lower yields are not a result of the disaster

and thereby reduce the yield. An agency's interpretation of its own regulations is given controlling weight unless plainly inconsistent with the regulation."

*Id.* at 693.

■ It is the District Court which "arguably misreads ¶ 414,"[26] but that is not the point.[27] The salient issue here is none of the explanations or justifications offered by the District Court for the agency's action, including the interpretation of ¶ 414 attributed to the agency, was ever articulated by the agency itself. · "An agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50, 103 S.Ct. at 2870. The District Court noted that reductions *were* imposed and assumed the agency made the determinations necessary to *allow* them to be imposed. This attempt to supply a reasoned basis for the agency's action therefore was impermissible and prejudicial. *See id.* at 43, 103 S.Ct. at 2866 (district court may not make up for deficiencies in agency record by supplying reasoned basis for agency action).

2. *Factual Basis Upon Which District Court Affirmed Agency Action Product of Post–Hoc Rationalization and Not Supported by the Record.*

 a. *Yield Reductions—The Kilgore Affidavit*

■ In relying on counsel's statements as to what was in the record and isolated bits of evidence, the District Court failed to identify and define facts supportive of the agency's decision as required by the law of this circuit. *See Hill v. Morton*, 525 F.2d at 328. Affirmance of agency action cannot rest on such infirm grounds. *See Heber Valley*, 503 F.2d at 98; *Pettyjohn v. Sullivan*, 776 F.Supp. 1482, 1485 (D.Colo.1991), *vacated and remanded on other grounds*, 13 F.3d 406 (10th Cir.1993) (citations omitted). The Court's

selective reliance on the affidavit of the Farmers' expert agronomist, Gary Kilgore, is illustrative.

As part of the administrative appeals process, the Farmers submitted the affidavit of Kansas agronomist Gary Kilgore. Aplts.' App. at 59–60. The affidavit sets forth the results of research undertaken by Kilgore in which he analyzed wheat yield data for southeast Kansas from 1983 to 1987. *Id.* at 59 (Kilgore Aff. at 1). Based on this data, Kilgore found "winter wheat planted in January and February can do as well as winter wheat planted in October, November and December, depending on the spring weather," and concluded there was "no scientific basis" for reductions in 1987 wheat yields of 15%–25% for wheat planted in January and 35%–50% for wheat planted in February. *Id.*

The Kilgore affidavit does not support the agency's conclusion that late planting was expected to result in lower yields, and neither the agency nor its counsel relied on it during the administrative process. Once review was sought in the District Court, however, the agency used a selective reading of the Kilgore affidavit to explain the agency's action and provide "support" for the reductions imposed. *See* Supp.R. II (Defs.' Mem. Supp.Mot. for J. at 4). The District Court adopted, verbatim, the government's *post hoc* rationalization, stating "defendants submitted evidence that showed wheat planted in November will produce between 74.8% and 83.3% of that planted in October." *Olenhouse*, 807 F.Supp. at 692 (citing Admin.R. at 62). It used this to conclude there was evidence to support the agency's determination that late planted wheat "would result in yield reductions." *Id.*

The government's reading of the Kilgore affidavit is not only an inadequate basis for review as a matter of law, it is insupportable as a matter of fact. The Kilgore affidavit

---

26. Paragraph 414 does not require the agency only to determine whether any of the lower expected production is the result of a disaster; it also requires the agency to determine whether any of the lower production is the result of a "changed practice" that is *not* the result of a disaster, and requires this determination to be made first. Handbook ¶ 414(A)(2)(c), (B)(2)(b).

The agency in this case failed to make the latter, threshold, determination.

27. We are not bound in our review by either the District Court's factual findings or its legal conclusions. *See Thomas Brooks Chartered*, 920 F.2d at 644.

indeed states that for crop years 1983–84 and 1986–87, wheat planted at Kilgore's experimental station in another Kansas county in October outproduced wheat planted in November. Aplts.' App. at 59. Yet it also states that for crop year 1985–86, wheat planted in January outproduced wheat planted in October. *Id.* Moreover, had the District Court reviewed other parts of the administrative record, it would have learned that in 1987, the crop year at issue, wheat planted in *January* outproduced wheat planted in either November *or* October. *See, e.g.,* Admin.R. at 591 (Olenhouse testimony).

Isolated bits of evidence, taken out of context and overwhelmed by other evidence, will not support an affirmance of agency action. By relying on such "evidence," the District Court committed reversible error.

b. *The Agency's Conclusion that the Farmers were not "Misinformed" Regarding Yield Reductions for Weather–Related Late Planting*

■ During the course of their administrative appeals, the Farmers argued they were misled by county and state ASCS officials regarding the effect of late planting. Admin.R. at 24–25, 700–778. They claimed information received at the January meeting in Topeka, the spring approval of their Wheat Program Applications, and the receipt of unreduced advances and disaster credits all indicated they would receive full payment under the program. *Id.* They asserted that despite numerous requests for clarification, the agency waited until December 1987, nearly one year after the wheat was planted, to notify the Farmers their yields were being reduced. *Id.* The agency rejected the Farmers' contentions, and summarily concluded they were "not misinformed." Aplts.' App. at 50.

The agency made no findings of fact regarding "misinformation" and articulated no explanation for its summary conclusion. In a demonstration of *ipse dixit,* it simply stated "our review [of the record] indicates [farmers] were not misinformed by county office personnel regarding payment yields." *Id.*

There can be no affirmance of agency action on this record because the record does not permit a reviewing court to assess whether the action was the product of reasoned decisionmaking. *Motor Vehicle Mfrs.,* 463 U.S. at 43, 50, 52–57, 103 S.Ct. at 2866, 2870, 2871–74.

■ There is no basis in the administrative record to support the District Court's upholding of the agency's conclusion that the Farmers were not misinformed. In finding there was support the District Court first relied on defendants' contention ˙ that the Farmers received written notice their yields may be reduced in November and December of 1986:[28]

> "[A]lthough plaintiffs present many sound arguments for lack of notice, the plaintiffs did have some notice and this court cannot find that the agency's finding of adequate notice was arbitrary and capricious."

*Id.* The administrative record does not support defense counsel's characterization of what it contained. Reading the record correctly, the District Court could not have concluded the November and December "notice" substantially supported the agency's conclusion.

The Notice of Yield and Acreage Bases (CCC Form 457) at issue is a standard form sent to all program participants at the beginning of the crop year. *See* Admin.R. at 819–959. Its purpose is to confirm the number of acres each farmer has in the program and set forth projected yields. *Id.* The "notice" to which defendants referred is boilerplate language notifying participants generally that program "yield[s] may later be reduced if practices actually carried out are different and would not normally produce the yields established." This language does not, as the government suggested in its briefs to the District Court for the first time on review, purport to notify the Farmers their 1987 yields would be reduced for late planting notwithstanding the fact of fall flooding. *See id.* Moreover, as these notices were sent months before the Topeka meeting and the Farmers' receipt of unreduced advances and

---

**28.** This contention was set forth for the first time by the government in its Response to Plaintiffs' Motion for Summary Judgment below. *See* Supp.R. II (Defs.' Resp.Pls.' Mot.Summ.J. at 1).

full disaster credit under the Wheat Program, they do nothing to address Farmers' misinformation claim or explain the agency's rejection of it.

Second, in rationalizing the agency's action the District Court relied upon and mischaracterized a single page of testimony from the state ASCS committee hearing. *Olenhouse,* 807 F.Supp. at 692 (citing Admin.R. at 623, testimony of Bob Olson). The District Court characterized Olson's testimony as

> "evidence . . . merely that the county committee did not indicate yield reductions (Admin.R. at 623); there was no evidence that yield reductions could not occur. Thus, because no assertions were given to plaintiffs saying that reductions were impossible, the agency found no misinformation."

*Id.* The testimony cited does not support the meaning ascribed it by the District Court. What Bob Olson said was he could not *"remember"* whether any member of the state committee at the Topeka meeting indicated farmers would receive reductions if they planted late. Admin.R. 623:15–21. This is not "evidence" of what the Farmers were told or not told by anyone, much less the county committee. Moreover, had the District Court reviewed the rest of the record regarding the Topeka meeting instead of relying on the agency's characterization of an isolated and irrelevant segment of Bob Olson's testimony, it would have discovered every member of the plaintiff class of farmers who attended the Topeka meeting and testified before the state committee swore under oath he was told to "go plant" his wheat and that as long as it was done in a "workmanlike manner," no yield reductions would be imposed. *E.g.,* Admin.R. at 626 (Olson testimony), 634 (Porter testimony); *see id.* at 734 (Walker letter), 735 (Eisele letter), 743 (McVey letter), 777 (Olenhouse letter).

### 3. The Procedure Used by the District Court was Fundamentally Inconsistent with the Review Process Required under the APA.

■ The District Court's reliance on arguments, documents and other evidence outside the administrative record is due, at least in part, to the illicit procedure it employed to determine the issues for review. The District Court processed the Farmers' appeal as a separate and independent action, initiated by a complaint and subjected to discovery and a "pretrial" motions practice. *See* Supp.R. II at Tab 5 (District Court Docket Sheet). After the District Court denied a motion filed by defendants seeking to dismiss the Farmers' appeal on grounds the Federal Court of Claims had exclusive jurisdiction and granted Farmers' motion for class certification (*see Olenhouse,* 136 F.R.D. at 679), defendants sought summary review of the Farmers' appeal by filing a "Motion to Affirm" the agency's action.[29] Supp.R. II at Tab 1. This motion was postured as one for summary judgment, supported by a statement of "undisputed facts" as required by Rule 206 of the Kansas Rules of Practice and Procedure and 44 pages of attachments. *Id.* The following day, the Farmers filed what they denominated a "Motion for Summary Judgment," but which was, in effect, their brief on appeal. *See id.* at Tab 2. Each side filed a response to the other's motion. *Id.* at Tabs 3, 4. Defendants appended a copy of their Motion to Affirm (including attachments) to their response to the Farmers' Motion for Summary Judgment. *Id.* at Tab 4. The appeal was decided on *defendants'* Motion to Affirm. *Olenhouse,* 807 F.Supp. at 690–93.

This process, at its core, is inconsistent with the standards for judicial review of agency action under the APA. The use of motions for summary judgment or so-called motions to affirm permits the issues on appeal to be defined by the appellee and invites

---

**29.** At oral argument before us, counsel for the government advised that he had asked persons in the District Court Clerk's office how to proceed and was advised to follow Rule 503 of the Kansas Rules of Practice and Procedure. That rule relates to the filing of social security appeals under Title 42, United States Code, and provides for the

filing of "an appropriate dispositive motion and memorandum." In local parlance the appropriate dispositive motion is called a "motion to affirm." For the reasons discussed herein (*see* n. 31, *infra,* and the cases cited therein), this rule and practice are specifically disapproved.

(even requires) [30] the reviewing court to rely on evidence outside the administrative record. Each of these impermissible devices works to the disadvantage of the appellant. We have expressly disapproved of the use of this procedure in administrative appeals in the past,[31] and explicitly prohibit it now.

■ A district court is not exclusively a trial court. In addition to its *nisi prius* functions, it must sometimes act as an appellate court. Reviews of agency action in the district courts must be processed *as appeals*. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure. Motions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal.

Based on these and other errors, the District Court misapplied the "arbitrary or capricious" standard applicable to informal agency action. It failed to engage in a substantive review of the record to determine if the agency considered relevant factors or articulated a reasoned basis for its conclusions. Instead, it relied on the *post hoc* rationalizations of counsel or attempted itself to supply a reasoned basis for agency action without regard to the contents of the administrative record. Any one of these errors would warrant reversal; their cumulative effect mandates it.

■ When a district court fails to conduct the requisite plenary review and make necessary factual findings to support the affirmance of agency action, we may either vacate its order and remand for further proceedings or we may conduct the necessary review ourselves based on the same administrative record considered by the district court. *Nickol,* 501 F.2d at 1392. Having already obtained and reviewed the administrative record in this case, we choose the latter course.

■ In reviewing the agency's action, we must render an independent decision using the same standard of review applicable to the District Court. *Webb v. Hodel,* 878 F.2d 1252, 1254 (10th Cir.1989). Once appealed, the District Court's decision is accorded no particular deference. *Id.*

### B. *The Farmers' Contentions on Appeal*

As set forth above, we review informal agency action under the standards set forth in *Overton Park* and *Motor Vehicle Mfrs.* We review the record for "substantial evidence." *See Data Processing, supra,* n. 22 and accompanying text. Because we reverse the agency's action on other grounds, we decline to reach the Farmers' constitutional claim. *See generally Rosenberg v. Fleuti,* 374 U.S. 449, 451, 83 S.Ct. 1804, 1806, 10 L.Ed.2d 1000 (1963) (federal courts should decline to rule on constitutional issues unless necessary).

### 1. *Appellants' Contention the Reductions Imposed were Arbitrary and Capricious.*

### a. *Yield Reductions Were Unsupported by the Administrative Record*

The Farmers contend the record does not support the yield and deficiency payment reductions imposed by the ASCS and affirmed by DASCO on administrative appeal. Aplts.' Br. at 19. The government disagrees, claiming the reductions were "based on the administrative record." Aplees.' Br. at 9. We find the agency's action unsupported by substantial evidence in the administrative record as it existed before the agency and thus "arbitrary or capricious" under APA § 706(2)(A).

■ Evidence is substantial in the APA sense if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Id.* at 684 (quoting *Illinois Central*

---

**30.** *See* Fed.R.Civ.P. 56.

**31.** *See Hamilton v. Secretary of Health & Human Svcs.,* 961 F.2d 1495, 1503–04 (10th Cir.1992) (Kane, J. concurring) (reversing district court's granting of motion to affirm in action to review denial of disability benefits); *Heber Valley,* 503

F.2d at 97–98 (summary judgment improper in action to review Department of Agriculture milk order); *Nickol,* 501 F.2d at 1391 (where the determination is under APA § 706, the district court is precluded from entering Fed.R.Civ.P. 56 type summary judgment).

*R.R. v. Norfolk & Western Ry.*, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966)). "Substantial evidence" is more than a mere scintilla; it must be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir.1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). Evidence is not substantial if it is overwhelmed by other evidence, *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir.1990), or if it constitutes mere conclusion, *see Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989).

■■■ The Farmers challenge the factual basis of DASCO's conclusion that they were not "misinformed" regarding the imposition of yield reductions for late planting. Aplts.' Br. at 23. They claim DASCO erroneously assumed the reductions at issue were imposed by the Wilson County Committee when, in fact, they were imposed by Lloyd Johnston. *Id.* at 22. The Farmers contend the committee explicitly determined *not* to reduce their yields, a determination upon which they relied. Although the administrative record is less than lucid as to what the original Wilson County Committee did, the evidence supports the Farmers', not the agency's, contentions regarding "misinformation" as to how and when yield reductions would be imposed.

At the Topeka meeting in early January 1987, the Wilson County ASCS Committee concluded yield reductions would not be imposed if farmers planted their wheat in a workmanlike manner. The Farmers planted, received advances and disaster credit (neither of which was reduced to reflect lower expected yields due to changed practices within the Farmers' control), and otherwise complied with Wheat Program regulations. In December 1987, the State Committee deemed Wilson County Committee's policy permitting late planting without reductions "unreasonable," and directed Lloyd Johnston to reduce participating farmers' yields. *See* Admin.R. at 39 and text, *supra,* at 1570–71. According to the Farmers, they had been led down the garden path.

We have already determined the District Court erred in affirming DASCO's conclusion that the Farmers had not been "misinformed" because DASCO failed to provide a reasoned explanation for the conclusion or identify the facts considered. *See* text, *supra* at 1578–79. We now find DASCO's conclusion is also unsupported by substantial evidence in the record and set it aside on those grounds as well. *See id.*

### b. Agency Misapplied Program Rules and Regulations

■■■ The Farmers assert the ASCS failed to comply with the laws governing the Wheat Program in reducing the Farmers' yields and deficiency payments. Aplts.' Br. at 25. Specifically, they claim the agency failed to consider the weather or determine Farmers' late planting was the result of causes beyond their control as required by 7 C.F.R. § 713.6 and ASCS Handbook ¶ 414(A), and contend the Secretary failed to communicate information regarding the 1987 crop season and changes to ¶ 414 in a timely manner as required under the Soil Conservation Act, 16 U.S.C. § 590h(b). *Id.* at 25–29.

Although DASCO ostensibly considered the Farmers' contentions, it summarily concluded the state and county ASCS committees "followed the correct procedures" when they reduced the Farmers' yields and deficiency payments. By failing to discuss the Farmers' contentions or make any findings of fact, DASCO provided no basis for its conclusion. Under the standard set forth in *Motor Vehicle Mfrs.*, 463 U.S. at 43, 50–57, 103 S.Ct. at 2866, 2870–74, we are unable to affirm because a determination that DASCO's action was the product of reasoned decisionmaking is impossible. Moreover, DASCO's action is not supported by substantial evidence in the record.

### Failure to consider relevant factors— fall 1986 flooding

Before yield reductions may be imposed, 7 C.F.R. § 713.6 requires the ASCS county committee to determine whether any reduction in the current year's yields was "the result of causes other than a natural disaster or other condition beyond the producer's control." As far as can be determined from the

record, the county committee made no such determination. District Manager Lloyd Johnston made the original decision to reduce the Farmers' yields on behalf of the county committee. He announced his decision in a letter dated December 30, 1987. *See, e.g.,* Aplts.' App. at 162. He cites "changed practices" in the form of "spring planting" as the reason for the reductions imposed, but makes no mention of weather conditions or the fact the county had been declared a disaster area. *See id.* Other than Mr. VonGarlem's passing remark in his June 1988 letter on behalf of DASCO that "county and state committee members are familiar with . . . weather conditions" in the area, there is no indication in the record that Johnston or any member of Wilson County Committee determined late planting was the result of causes within the Farmers' control. In fact, the record supports the opposite conclusion.

Throughout the spring and summer of 1987 (well before they were notified of any yield or deficiency payment reductions for the 1987 crop year), the Farmers applied for federal disaster credit on their 1987 crops. Admin.R. at 1313–1318, 1330–1332, 1402–1449, 1491–1499 (CCC Form 574 requests). Without exception, the reasons given for seeking disaster credit related to the fall rains. *See, e.g.,* Admin.R. at 1412 (Lee Bradford Application, condition affecting crop identified as "late planted due to weather"), 1414 (Carlson Brothers, "wet weather prevented timely planting"), 1472 (Don Olenhouse, "excessive moisture"), 1498 (Dale Sharp, "excessive wetness and/or flooding of acres").

In order to receive disaster credit under Wheat Program regulations for prevented planting or failed acreage, there must be a determination by the county committee that the prevented planting or failed acreage was the result of "a natural disaster or other condition beyond the producer's control." 7 C.F.R. § 713.105(b) (prevented planting), (c)

(failed acreage). *This is the same standard that prevents the imposition of yield reductions under § 713.6(c)(1).* Thus, it is axiomatic that any determination by the county committee that the Farmers were entitled to disaster credit under § 713.105 prohibits the county committee from imposing yield reductions under § 713.6.[32]

The opposite occurred in this case. In March through June 1987, the Farmers received approval of their applications for disaster credit. *See* Admin.R. at 1318–1329, 1343–1384, 1457–1490. Yet in December 1987, their yields were reduced. This agency action cannot be reconciled. Rain-induced "late planting" cannot be the result of conditions "beyond the Farmers' control" for the purpose of disaster credit, but the result of conditions "within their control" for the purpose of yield reductions. We find the agency's contrary conclusion both arbitrary and capricious.

*Failure to Communicate Changes in Wheat Program Regarding Yield Reductions Under 16 U.S.C. § 590h(b)*

The Farmers assert the Secretary failed to comply with 16 U.S.C. § 590h(b) by failing to communicate changes in Wheat Program rules and policy in a timely manner. The essence of the Farmers' argument is not the Secretary's alleged failure to comply with the Soil Conservation Act, but the effect that failure had on the Farmers' decision to plant program wheat in the Spring of 1987. We have already concluded the agency's determination that the Farmers were not "misled" by the agency's silence must be set aside as unsupported by the administrative record, and no further elaboration is needed.

### c. *Failure to Observe Minimum Procedural Safeguards*

The Farmers contend the administrative appeals process in this case was flawed and contrary to ASCS regulations. Aplts.' Br. at

---

**32.** The government argues this constitutes double-payment and "farming the program." *See* Aplees.' Br. at 7. We disagree. A disaster *credit* under 7 C.F.R. § 713.105 is not the same as a disaster *payment* under § 713.131. As discussed *supra* at n. 4, a farmer's yields under the Wheat

Program are established by averaging his yields over the previous five years. 7 C.F.R. § 713.6(a). Disaster "credit" is thus necessary to avoid a reduction in a farm's established yield by averaging in a year that was low due to no fault of the producer.

29. Specifically, the Farmers claim the agency kept an inadequate record of the appeals process; failed to acknowledge, incorporate or consider relevant facts presented by individual Farmers, instead reaching generic conclusions announced by form letter; and erroneously rejected their request to confront and cross-examine Lloyd Johnston. *Id.* at 29–30. The gist of the Farmers' contentions is the agency failed to conduct the appeals process in a manner most likely to obtain the necessary facts, violating their right to a fair hearing and resulting in a decision both arbitrary and capricious. *Id.* at 30. We agree.

 Wheat Program regulations make no provision for a hearing on initial determinations by the county committee. They do, however, entitle a dissatisfied program participant to a multi-level appeal of that initial decision, and an informal hearing at each level. 7 C.F.R. §§ 780.7(a)–(c), 780.8; *see Garvey v. Freeman,* 397 F.2d at 604; *Esch v. Yeutter,* 876 F.2d at 992. Where deficiencies in the administrative appeals process call into question whether adjudicative officials considered all relevant factors, agency action will be set aside. *Esch,* 876 F.2d at 993. Agency action will also be set aside if the administrative process employed violated "basic concepts of fair play." *Garvey,* 397 F.2d at 612. From what we can determine from the record, the appeals process in this case failed on both counts.

 Wheat Program regulations require the reviewing authority to conduct informal hearings "in the manner determined by CCC or ASCS to most likely obtain the facts relevant to the matter at issue"; [33] to provide participants a "full opportunity" to present testimony and documentary evidence; [34] to make available upon request "copies of docu-

ments, information, or evidence upon which a determination is made or which will form the basis of the determination ... including minutes from county committee or State committee proceedings"; [35] to prepare, before the hearing, "a written record which [sic] contains a clear, concise statement of the facts as asserted by the participant and material facts found by the reviewing authority"; [36] and to provide participants with a written notification of the determination that "shall clearly set forth the basis for the determination." [37]

The agency fell short of complying with these regulations in two important respects. As we have already concluded, neither the state committee nor DASCO set forth the basis for their determinations other than to state the Farmers planted their winter wheat in the spring. The agency did not address the fundamental issues raised by the Farmers, namely, that timely planting was impossible due to heavy rains and flooding during the fall planting season; they had been told to "go plant" without risk of reductions; and that Lloyd Johnston failed to make the requisite determination that the reduced yields were due to causes "other than a natural disaster or other condition beyond the producer's control." *See* 7 C.F.R. § 713.6.

Additionally, the agency failed to provide the Farmers with a "full opportunity" to present facts and information relevant to the reductions at the hearing before the state committee. The record indicates the Farmers' counsel asked at the hearing to question Lloyd Johnston, the individual who made the initial determination to reduce the Farmers' yields.[38] In response, state ASCS director Bill Mosier told the Farmers' counsel the hearing was "for producers to give input to the state committee, and Mr. Johnston is not

---

33. 7 C.F.R. § 780.9(b).

34. *Id.* at 780.9(g), 780.3 (defining "hearing" under this Part).

35. *Id.* § 780.9(c).

36. *Id.* § 780.9(d).

37. *Id.* at 780.17(a).

38. The fact it was an individual, rather than the county committee, who made the initial decision

to reduce the Farmers' yields also concerns us. The statutory and regulatory scheme governing the Wheat Program and USDA programs generally makes clear the tremendous reliance placed on the committee system. *See* text, *supra,* at 1568. It explicitly requires field decisions affecting farmers' payments under the Wheat Program to be made by a committee of three local farmers, each of whom participates or cooperates in the same or similar programs. *Id.*

available." Admin.R. at 492:4–8. By refusing to make Johnston available, the agency denied the Farmers a "full opportunity" to present relevant facts in violation of 7 C.F.R. §§ 780.3, 780.9(g).

Notwithstanding any specific violation of the appeals regulations, the agency's refusal to permit the questioning of Johnston violated the minimum standards for a fair hearing. In *Garvey v. Freeman*, we stated the procedural hierarchy for hearings and appeals under 7 C.F.R. § 780 must conform with "basic concepts of fair play," including "a full, albeit informal, discussion of the pertinent issues *with the rights of confrontation and cross-examination.*" *Garvey*, 397 F.2d at 612 (emphasis added). The Farmers were denied these rights. This denial raises serious questions as to whether the reviewing authorities considered all relevant factors in reaching their decision.

## V. *Conclusion*

The decision of the District Court granting the "Motion to Affirm" is reversed and the case remanded. The District Court is instructed to enter judgment in favor of Plaintiffs–Appellants.