**SIERRA CLUB, a non-profit corporation, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, the Secretary of Energy, in his official capacity, and United States Corps of Engineers, Defendants.**

**No. CIV. A. 97–B–529.**

United States District Court,
D. Colorado.

Feb. 2, 2001.

Neil Levine, Denver, CO, for plaintiff.

Charles C. Carlson, James D. Long, Jr., Derek G. Passarelli, John A. Herrick, U.S. Dept. of Energy, Golden, CO, Stephen D. Taylor, U.S. Attorney's Office, Denver, CO, for defendants.

## ORDER

BABCOCK, Chief Judge.

Plaintiff Sierra Club filed this case challenging actions of Defendants United States Department of Energy, the Secretary of Energy (collectively, DOE), and the United States Corps of Engineers (Corps) with respect to proposed expansion of a gravel mining operation located on Rocky Flats, a federal property, based on alleged violations of: 1) the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332; 2) the Endangered Species Act (ESA), 16 U.S.C. § 1536; 3) Executive Order 11990 (EO 11990), 42 U.S.C. § 4321; and 4) the Clean Water Act (CWA), 33 U.S.C. § 1344. Sierra Club contends that Defendants' actions are arbitrary, capricious and contrary to plain regulatory language in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). Because I conclude Sierra Club has failed to establish that these issues are ripe for review, I dismiss this action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction.

### I.

### Procedural Posture

The parties submitted cross-motions for summary judgment supported by

the Administrative Record. In the Tenth Circuit, the use of summary judgment procedures by the district court "is inconsistent with the standards for judicial review of agency action under the [Administrative Procedure Act]" primarily because summary judgment "permits the issues on appeal to be defined by the appellee and invites (even requires) the reviewing court to rely on evidence outside the administrative record." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir.1994). Rather, the district court's review of agency actions "must be processed as appeals." *Id.* at 1580. I do not reweigh the evidence, but must rely on the rationale of the pertinent agencies. *See id.* at 1577 *citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Thus, at oral argument the parties were informed that I would consider this case as an appeal.

## II.

### Facts

#### A. Background

The following facts are established by the Administrative Record (AR). In 1951, the United States acquired the ·Rocky Flats facility, located immediately east of Colorado State Highway 93, between Golden and Boulder, Colorado. From 1952 to 1992, the Rocky Flats facility processed plutonium and produced nuclear warhead triggers. In 1975, ·the government acquired additional surface rights to increase the size of the buffer zone (Buffer Zone) around the inner plant facilities. After this expansion, the site totaled 6,500 acres.

In 1977, the DOE took over the administration of Rocky Flats. In early 1992, plutonium processing ceased at Rocky Flats based, in part, on the ground contamination occurring in the area immediately surrounding the plant. Many portions of the larger Buffer Zone, however, escaped contamination.

Until 1992, the owners of the Rocky Flats subsurface were precluded from accessing their mineral rights. The subsurface mineral rights owners leased their rights to Western Aggregates, Inc.(WAI), which operates an existing gravel pit and grading facility directly west of the Buffer Zone. The challenged proposed mining operation would expand the existing gravel mine to approximately 425 acres located in the Buffer Zone.

The Buffer Zone is not accessible to the general public. Thus, the land is relatively untouched and pristine. The proposed mining area is located on a gravel plain that stores water in the spaces between the rocks. This relative abundance of water allows vegetation and wildlife to prosper in this area including one of twenty remaining xeric tall grass prairies in the world and a large population of the Preble's Meadow Jumping Mouse (the Mouse). On May 13, 1998, the United States Fish and Wildlife Service (FWS) listed the Mouse as a threatened species under the Endangered Species Act. 63 Fed.Reg. 26517.

#### B. Proposed gravel mining expansion

WAI is presently mining gravel on the original mining site under existing permits issued by Jefferson County in 1987 and by the Colorado Mined Land Reclamation Board (the Colorado Board) in 1991. Plaintiff does not challenge the current mining operations.

In 1997, Jefferson County approved, conditionally, WAI's rezoning application. *See* Ex. A; 2/13/96 Jefferson County Board of County Commissioners Resolution No. CC967–28, AR, Vol. I, Sec. A, Tab 19. In addition, WAI applied for and received an expansion of its existing mining permit from the Colorado Mined Land

Reclamation Board of the Colorado Department of Natural Resources. Ex. B, 5/11/94 Colorado Board Notice of 112 Regular Reclamation Permit Amendment Application Consideration, AR, Vol. I, Sec. B, Tab 11. Before WAI can commence expanded mining operations, however, it must expend additional efforts and resources to obtain final regulatory approval from both Jefferson County and the Colorado Board. *See id.*

### 1. Prerequisites

Pursuant to the February 13, 1996, Jefferson County rezoning resolution, WAI must meet mandatory requirements to protect the hydrological and ecological resources in the proposed mining area. *See* Ex. A. §§ 2.b, p. 4; 2.d, p. 6. WAI must submit hydrological studies and tall grass prairie studies to Jefferson County and a mine operation plan. *Id.* Jefferson County then must approve the studies and the mine operation plan and make a finding that the studies support the proposed gravel mining expansion. *Id.*

The hydrological study required by Jefferson County cannot be completed until 2001 at the earliest:

No mining or other associated activities, except an access road shown on the Official Development Plan graphic, shall occur on Phases 2B, 3B, and 4–7 until a detailed site specific hydrologic study is performed on the total acreage permitted in M91–1 and Z94–53 over a minimum five year period, with seven or more years being optimum.

Exhibit A.

Likewise, the required biological study cannot be completed until at least 2001:

Phases 2B, 3B and 4–7 area shall be designated as an area that mining and associated activities shall not disturb except as shown on the ODP graphic for at least five years while a detailed study is conducted on the condition and extent of the remaining rare tall grass prairie in Jefferson County.

*Id.* at § 2.d, p. 6. Furthermore, before the mining expansion can proceed, WAI must post reclamation bonds pursuant to Jefferson County and the Colorado Board's requirements. *See* Ex. A, AR, Vol. I, Sec. A, Tab 19; AR Vol. I, Sec. B, Tab 11. There is no record evidence that WAI has completed either of the studies, prepared the Plan, or posted the bonds. Nor is there evidence when, or whether, Jefferson County will find the studies to be scientifically and legally sufficient and approve the mine plan of operations.

Moreover, WAI must obtain several permits and approvals before it may proceed with the expansion of its gravel mining operation. These prerequisites include:

— Jefferson County Zoning Approval

— Air Quality Amendment from the Colorado Department of Health

— Colorado Mined Land Reclamation Board Permit Amendment

— Colorado Dept. of Transportation Highway Access Permit

AR, Vol. I, Sec. B, Tab 11, p. 8.

### III.

### A. Claims One and Two against DOE for Alleged NEPA Violations

Plaintiff claims that the DOE violated NEPA by: 1) granting a road easement; and 2) not generating an environmental impact statement (EIS) with respect to the proposed mining expansion.

Soon after WAI applied to Jefferson County to expand its mining operations beyond those allowed under its existing permits, Jefferson County requested that Defendant DOE, as the owner of the severed nonmineral surface estate, cosign the mining company's rezoning application. (June 24, 1994, letter from WAI to Defendant DOE, AR, Vol. I, Sec. B, Tab 9, first

document, second paragraph; June 22, 1994, letter from Jefferson County to WAI, AR, Vol. I, Sec. B, Tab 9, second document.) DOE refused to cosign WAI's rezoning application. Instead, DOE took the position that it neither supported nor opposed WAI's rezoning application and application for extension of its then-existing mining permit. AR, Vol. I, Sec. B, Tab 4. Rather, DOE sought to have Jefferson County impose a number of environmental restrictions and mitigation measures concerning alteration to these habitats.

After DOE refused to endorse WAI's rezoning application, in the summer of 1994, Jefferson County and the Colorado Board sought DOE's comments in its capacity as the owner of the severed non-mineral surface estate. *See,* AR, Vol. I, Sec. B, Tabs 10–11. DOE responded by suggesting a number of environmental mitigation measures to be included in any rezoning based on concerns that there was insufficient information how WAI "intend[ed] to preclude alteration of these habitats and hydrologic resources in the area." AR, Vol. I, Sec. F, Tabs 3–4.

Also in connection with the proposed mining expansion, DOE issued WAI: a) a road relocation license; b) a road easement; and c) a license to the mining company to place an air monitoring device on an existing DOE antenna. Second Amended Complaint, ¶¶ 29–31. During oral argument, Sierra Club withdrew their claims to the extent they are based on the road relocation license and the air monitoring device.

The DOE granted a road easement on July 27, 1995 and issued a NEPA Categorical Exclusion for the road easement. AR, Vol. I, Sec. B, Tab 6. The easement allows the WAI to build a road to the proposed expanded gravel mining site on DOE land. There is no evidence, however, that the road has been or is being constructed. In addition, an express provision of the ease-

ment prohibits WAI from conducting any gravel mining operations on the proposed new site for twenty-five (25) years after it receives final approval for expanded gravel mining from Jefferson County and the Colorado Board:

> The term of this MOU shall be twenty-five years *beginning upon the date WAI* [the mining company] *obtains final approval to commence mining operations from all permitting authorities* having jurisdiction over WAI's proposed planned development of the Spicer Lease and ending twenty-five years after that date. Upon WAI's receipt of such approval, WAI shall provide DOE with written notice specifying the date of approval.

MOU, AR, Vol. I, Sec. B, Tab 2 (emphasis added); *see also* Second Amended Complaint, ¶ 30; Utility Right of Way Grant of Easement, AR, Vol I, Sec. B, Tab 3;

 NEPA was enacted by the United States Congress to ensure that all federal agencies consider environmental impacts in their decisionmaking process. *See Sierra Club v. Hodel,* 848 F.2d 1068, 1088 (10th Cir.1988). Furthermore, NEPA provides a forum for the public to be informed of and comment on the environmental effects of the proposed agency action. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Thus, a federal agency must circulate a detailed environmental impact statement (EIS) for public review and comment. *Hodel,* 848 F.2d at 1093–94; 42 U.S.C. § 4332(2)(c). NEPA requires a federal agency to make informed, but not necessarily wise, decisions. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Environmental Defense Fund v. Andrus,* 619 F.2d 1368, 1374 (10th Cir.1980).

■ At this point, WAI's proposed mining operation expansion is merely a potential event with multiple unmet conditions precedent. Undoubtedly, NEPA will require preparation of an EIS if the permitting prerequisites are fulfilled and WAI chooses to proceed with its proposal. Thus, the claimed environmental harms remain "contingent, not certain or immediate." *See State of Utah v. United States Dept. of Interior,* 210 F.3d 1193, 1197 (10th Cir.2000) *citing Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998).

**B. Claims Three through Six against DOE for Alleged Violations of the Endangered Species Act, 16 U.S.C. § 1531,** *et seq.*

On May 13, 1998, the Secretary of the Interior listed the Preble's Meadow Jumping Mouse as a threatened species under the ESA. According to the Sierra Club, DOE violated ESA § 7(a)(2) by not consulting with the FWS to assess the impacts of WAI'S proposed sand and gravel mine on the Mouse and its Buffer Zone habitat.

■ The ESA was enacted by Congress in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species". 16 U.S.C. § 1531(b).

Under ESA § 4, the Secretary is "required to make determinations about the status of certain species, including whether a given species qualifies for designation as endangered or threatened." *See* 16 U.S.C. § 1533(a)(1). Once a species has been categorized as either endangered or threatened, it is unlawful under ESA § 9 "for any person subject to the jurisdiction of the United States to perform specified activities with regard to that species, including 'taking the species' or 'violat[ing] any regulation pertaining to such [endangered] species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by this chapter.'" 16 U.S.C. § 1538(a)(1).

ESA § 7 requires agency consultation with the FWS when the agency's action "may affect" a listed species. 50 C.F.R. § 402.14(a). The evidence confirms that " the hydrological regime in the Rock Creek watershed currently supports one of two known populations of the [Mouse]." AR Vol. III, Sec. A, Tab q. Moreover, "the proposed mining and its possible impacts may affect the unique hydrology of the area." *Id.* at AR Vol. I, Sec. B, Tab 4.

To date, however, WAI's expansion efforts have been devoted principally to obtaining the necessary county and state permits and approvals. Specifically, county approval is conditioned upon, *inter alia,* the completion of two five-year hydrological and ecological studies. When and if these studies are completed, Jefferson County then has discretion to modify its zoning approval based on the study results. As a result, the proposed mine expansion remains largely conditional. Because the Mouse population is fluid and subject to myriad events not related to this litigation, the effects of the proposed mining expansion are more accurately assessed when, if ever, WAI's proposal clears its many hurdles.

**C. Claim Seven against DOE for Alleged Violation of Executive Order No. 11990**

■ Plaintiff alleges that pursuant to EO 11990, DOE violated its duty to protect and conserve wetland habitat on federal property. EO 11990 states that federal agencies, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wet-

lands unless the head of the agency finds 1) that there is no practicable alternative to such construction, and 2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use. EO 11990, § 2; 42 Fed.Reg. 26961. An agency may consider economic, environmental and "other pertinent factors" in making these findings. *Id.*

The parties agree that DOE is party to a wetlands banking agreement. *See* AR, Vol. I, Sec. A, Tab 22; AR, Vol. IV, Sec. B, Tab 1. WAI's plans for expansion remain hypothetical, however, and subject to the approval of several permits and potential modification by county and state agencies. Moreover, WAI has not submitted construction proposals on either of the two DOE sites which would effect the area for the proposed mining expansion. Therefore, EO 11990's requirements have not been triggered. In any event, analysis at this stage would be premature.

**D. Claim Eight against the Corps of Engineers for Alleged Violation of the Clean Water Act, 33 U.S.C. § 1344**

■ "In 1972 Congress enacted the Clean Water Act 'to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *Sierra Club v. Lujan,* 972 F.2d 312, 313 (10th Cir.1992). Under CWA § 1311, it is illegal to discharge pollutants into United States waters unless authorized by specific sections of the Act. *Id.* Under the CWA, dredge or fill material may not be discharged without obtaining from the Corps a permit, commonly known as a § 404 permit. 33 U.S.C. § 1344(a); *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1524 (10th Cir.1992). The phrase "United States waters"includes wetlands which the Corps has a "particular duty under the CWA to protect...." *Id.* As part of the permit process, the Corps is

obligated to conduct a "public interest review." 33 C.F.R. § 320.4(a).

Pursuant to WAI's expanded mining proposal, Defendant Corps made wetlands delineations applicable if and when WAI completes the prerequisites imposed by Jefferson County and the Colorado Board. In addition, the Corps informed the interested parties that a CWA § 404 permit would be required "[i]f any work associated with this project requires the excavation in or placement of dredged or fill material, either temporary or permanent, into any drainage at this location, this office should be immediately contacted for proper Department of the Army permits pursuant to Section 404 of the Clean Water Act." *See* AR, Vol. V, Sec. 1–2.

There is no evidence that WAI has submitted an application for a § 404 permit nor has the Corps processed any § 404 permit application on behalf of WAI. Until WAI submits a § 404 permit, Defendant Corps is under no obligation to evaluate the potential impact of WAI's proposed mining expansion.

**IV.**

**Standing and Ripeness**

Against the backdrop of the facts and law outlined above, Defendants argue this suit is nonjusticiable both because Plaintiff lacks standing to bring this case and because the issues are not yet ripe for adjudication. I need not address Sierra Club's standing to maintain this suit when ripeness is also challenged. *See Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *State of Utah v. United States Dept. of the Interior,* 210 F.3d 1193, 1196 (10th Cir.2000).

Defendants contend Plaintiff's claims are not ripe because WAI is far from obtaining regulatory authorization from

Jefferson County and the State of Colorado to expand its gravel mining operations.

The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 58 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38, (1993). The basic rationale for the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). When assessing ripeness, I must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507.

The Supreme Court lists the following considerations for evaluating ripeness: 1) whether delayed review would cause hardship to the plaintiff; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented. *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

In *Ohio Forestry,* the Supreme Court considered the ripeness of the Sierra Club's challenge to the lawfulness of a federal land and resource management plan which the United States Forest Service had adopted. The Court noted that while the plan set logging goals, selected the areas of the forest suitable for timber production, and determined appropriate methods of timber harvest, it did not itself authorize the cutting of any trees. *Id.* at 729, 118 S.Ct. 1665. Before the Forest Service could permit logging, it had to pass through several steps, including: 1) providing those affected by the proposed logging notice and an opportunity to be heard; 2) completing an environmental analysis pursuant to NEPA; 3) rendering a final decision to permit logging; 4) and justifying the proposal in court if challenged. *Id.* at 729–30, 118 S.Ct. 1665. Accordingly, the Court concluded the Sierra Club's challenge was not ripe because the plan did not inflict significant practical harm upon the interests that the Sierra Club advanced. *Id.* at 733, 118 S.Ct. 1665.

As in *Ohio Forestry,* the Sierra Club will not suffer significant hardship if I withhold court consideration of its claims at this time. Plaintiff seeks to intervene at this stage in the licensing approval process to ensure that environmental factors are adequately considered pursuant to NEPA, the ESA, the CWA and EO 11990. Sierra Club will have ample opportunity to raise its environmental concerns when, if ever, the state and county licensing process is completed. Because no expanded mining activities are ongoing or even imminent, Plaintiff will suffer no hardship by the denial of review at this time.

The second *Ohio Forestry* factor, the effect of judicial intervention, weighs against consideration of Sierra Club's claims at this time. If, in the future, WAI proceeds with its proposed mining expansion plan, Defendants will be required to take action. At this point, however, any judicial intervention in the agency process would interfere improperly with legislatively established requirements and procedures. Such action on my part would be premature and "an exercise in speculative gymnastics." *See Park Lake Resources Limited Liability Co. v. USDA,* 197 F.3d 448, 452 (10th Cir.1999).

■ Moreover, consideration of the issues presented by the parties would benefit from further factual development. In *Norvell v. Sangre de Cristo Dev. Co.*, 519 F.2d 370 (10th Cir.1975), the Tenth Circuit considered the need for further factual development when evaluating the ripeness doctrine in the context of an Indian land lease. In *Norvell,* the State of New Mexico sought to assert jurisdiction over an Indian land lessee and its activities under the lease. While the *Norvell* litigation was pending, activities under the lease were enjoined because the parties had not complied with NEPA. When the *Norvell* appeal subsequently reached the Tenth Circuit, the Court held that the case was not ripe because all activities under the lease were in limbo pending compliance with NEPA and a possibility existed that the project would not meet the requirements of NEPA. *Norvell,* 519 F.2d at 377–79. Accordingly, the action did not present a justiciable case or controversy. *Id.* at 377. Further, the possibility of the project's disapproval as a result of ongoing review rendered the action improper for declaratory disposition. *Id.* at 378–79.

Concluding the action was not ripe, the *Norvell* Court stated: "The subject 99–year lease has not been approved [or] measured by NEPA requirements and it is speculative when or conceivably whether it shall meet NEPA requirements." *Id.* at 375. In addition, the Court noted: "[W]e do not know whether the development project shall go forward or, if ultimately authorized following the environmental considerations, the precise activities which may be permitted on the leased lands." *Id.* at 376. The Court concluded that "[n]o significant hardship will accrue to the State of New Mexico" because the "State can do no more than presently allege that if the project is approved and developed, it may fall within the statutory ambits. Such is insufficient to meet the case or controversy tests." *Id.*

Similarly, the Sierra Club will suffer no significant hardship because it can do no more than presently allege that if the proposed mining expansion is approved and developed, it may detrimentally impact the environment. Sierra Club's claimed harms are contingent, not certain or immediate. *See Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (claim not ripe if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all); *State of Utah,* 210 F.3d at 1197. At this point, I cannot be certain: 1) whether, after these many years, WAI will proceed with its proposal; 2) whether the State of Colorado and Jefferson County will issue licenses to WAI; 3) of the precise nature of the proposed mining expansion in light of any modifications by WAI, Jefferson County or the State and 4) whether the proposed expansion, if any, would present unacceptable environmental risks.

After consideration of the *Ohio Forestry* factors, each of which weighs clearly against further judicial action at this time, I conclude Sierra Club's suit is not ripe for review.

Accordingly, IT IS ORDERED that:

1. Plaintiff's claims are DISMISSED without prejudice;

2. because this action is not ripe, all parties shall bear their own costs; and

3. the Clerk of the Court SHALL ENTER JUDGMENT consistent with the Orders contained herein.