SIERRA CLUB and Center For Native Ecosystems, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF ENERGY and Spencer Abraham; in his official capacity as Secretary of Energy, Defendants.

and

Mineral Reserves, Inc., Defendant–Intervenor.

No. CIV. 97–B–529(PAC).

United States District Court, D. Colorado.

Nov. 22, 2002.

Colin Christopher Deihl, Faegre & Benson, Denver, CO, Neil Levine, Earthlaw University of Denver-Forbes House, Denver, CO, for Plaintiffs.

Derek G. Passarelli, John A. Herrick, U.S. Dept. of Energy, Golden, CO, Robert D. Clark, Attorney General's Office, Denver, CO, Stephen D. Taylor, U.S. Attorney's Office, Denver, CO, David Alan Bailey, Schwarz Semenoff McNab & Bailey, P.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706,

Plaintiffs Sierra Club and Center for Native Ecosystems (collectively, Plaintiffs), seek declaratory and injunctive relief against Defendant Department of Energy (DOE) based on their claims that DOE violated: 1) the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA) by failing to prepare an environmental assessment (EA) or environmental impact statement (EIS) prior to its decision to grant a road easement; and 2) the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (ESA) by failing to consult with the Fish and Wildlife Service before granting the easement. After consideration of the petition, briefs, and counsel's arguments at the November 1, 2002 hearing, I grant the relief sought.

## I.

### Procedural History

On March 17, 1997, Plaintiff Sierra Club filed suit alleging eight claims, including violations of NEPA, ESA, and the Clean Water Act against Defendant DOE and the United States Army Corps of Engineers.

On February 2, 2001, I dismissed Sierra Club's Second Amended Complaint concluding that the claims against DOE were not ripe for adjudication. *See Sierra Club v. United States DOE,* 150 F.Supp.2d 1099 (D.Colo.2001) (*Sierra Club I*). On appeal, the Tenth Circuit held the case ripe for adjudication and reversed and remanded for further proceedings as to Plaintiff's NEPA and ESA claims. *See Sierra Club v. United States DOE,* 287 F.3d 1256 (10th Cir.2002) (*Sierra Club II* ).

After remand, Plaintiff Sierra Club filed a Third Amended Complaint in which the Center For Native Ecosystems joined as a plaintiff. On August 30, 2002, I granted Defendant Mineral Reserves, Inc. (MRI),

an assignee of the road easement at issue, leave to intervene.

## II.

### Facts

In 1951, the United States acquired the Rocky Flats facility, located immediately east of Colorado State Highway 93, between Golden and Boulder, Colorado. From 1952 to 1992, the Rocky Flats facility processed plutonium and produced nuclear warhead triggers. In 1975, the government acquired additional surface rights to increase the size of the buffer zone (Buffer Zone) around the inner plant facilities. After this expansion, the site totaled 6,500 acres.

In 1977, the DOE took over administration of Rocky Flats. In early 1992, plutonium processing ceased at Rocky Flats based, in part, on ground contamination occurring in the area immediately surrounding the plant. Many portions of the larger Buffer Zone, however, escaped contamination.

Until 1992, the owners of the Rocky Flats subsurface were precluded from accessing their mineral rights. The subsurface mineral rights owners leased their rights to Western Aggregates, Inc. (WAI), which operated an existing gravel pit and grading facility directly west of the Buffer Zone. Defendant MRI is the current holder of all property rights, permits and other interests previously applied for or received by WAI.

The Buffer Zone contains one of twenty remaining xeric tall grass prairies in the world and a large population of the Preble's meadow jumping mouse (the Mouse). On May 13, 1998, the United States Fish and Wildlife Service (FWS) listed the Mouse as a threatened species under the ESA. See 63 Fed.Reg. 26517. Two hundred acres of the Buffer Zone are used by the DOE as a National Wind Technology Center (NWTC).

In 1997, WAI applied for and received an expansion of its mining permit from the Colorado Department of Natural Resources. The proposed expansion would expand the existing gravel mine to approximately 425 acres located in the Buffer Zone, including a part of the land comprising the NWTC. Jefferson County, Colorado, conditionally approved WAI's rezoning application for the area.

Pursuant to the rezoning resolutions, MRI is required to meet mandatory requirements to protect the hydrological and ecological resources in the proposed area, including submission of hydrological and tall grass prairie studies and a mine operation plan to Jefferson County for approval. MRI must also post reclamation bonds, and obtain other permits such as an air quality amendment from the Colorado Department of Health, a Colorado mined land reclamation board permit amendment, and a Colorado Department of Transportation highway access permit before it may commence mining operations on all but 20 acres of the expanded acreage. Since this action was filed, the required state air quality permit has been issued.

In July 1995, the DOE issued a road easement (Easement) to WAI, giving rise to Sierra Club's claims underlying this appeal. The Easement allows WAI and its successor MRI to construct a road from Highway 128 across the NWTC to the proposed mining expansion and the existing mining operations, thus facilitating the off-site removal of the mined sand and gravel. The use and occupation of the road were made subject to such rules and regulations as may be prescribed by the Golden, Colorado, DOE field office manager. Pursuant to a memorandum of understanding (MOU) accompanying the Easement, WAI agreed not to conduct any mining operations on that portion of the property comprising the NWTC for a peri-

od of twenty years after receiving approval from Jefferson County to do so. The grant of easement contains a clause stating that:

> [t]he construction, use, and/or operation and maintenance of said easement shall be performed without cost or expense to the Government under the general supervision and subject to the prior approval of the Manager of the Golden Field Office of the Department of Energy.

AR, Vol. I, § B, Tab 3.

Furthermore, the MOU contains the following clause:

> DOE agrees that upon mutual agreement between WAI and DOE of appropriate terms and conditions, DOE shall grant to WAI an easement traversing the NWTC over which WAI may construct, at no cost to DOE, a roadway connecting WAI's existing facilities to Highway 128 on the north. The general location of this easement is more particularly described in Attachment D which is incorporated herein by this reference.

AR, Vol. I, § B, Tab 2.

### III.

■■■ A federal agency's compliance with NEPA and ESA is subject to review under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* (APA). Pursuant to the APA, 5 U.S.C. § 706, review of an agency action is treated in the district court as an appeal. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir.1994). The appellate review "requires a plenary review of the record as it existed before the agency." *Id.* at 1576. I must review the agency's decision-making process and determine whether the agency examined all relevant data and articulated a satisfactory explanation for its action. *Id.* at 1575 *citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d

443 (1983). A court's review of an agency's decision is generally limited to a review of the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Olenhouse*, 42 F.3d at 1579–80. The "agency action must be examined by scrutinizing the administrative record at the time the agency made its decision." *Asarco, Inc. v. United States EPA*, 616 F.2d 1153, 1159 (9th Cir.1980); *Sportsmen's Wildlife Defense Fund v. Romer*, 29 F.Supp.2d 1199, 1211 (D.Colo.1998). I do not re-weigh the evidence. *Id.*

Under the APA, I may overturn an agency action only if the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) and (C). While the inquiry under the arbitrary and capricious standard must be "searching and careful," "the ultimate standard of review is a narrow one." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Tenth Circuit explained what constitutes arbitrary and capricious agency action:

> Generally, an agency decision will be considered arbitrary and capricious if the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir.1997).

Under this standard, the agency must take a "hard look" at the environmental consequences of the action. *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The Tenth Circuit has consistently applied deference in NEPA cases. *Comm. to Preserve Boomer Lake Park v. Dep't. of Transp.*, 4 F.3d 1543, 1555 (10th Cir.1993)(agency decision to issue FONSI and not prepare EIS "is reviewed under the deferential arbitrary and capricious standard of review"); *Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 972–73 (10th Cir.1992).

■ It is the plaintiff's burden to prove that these criteria are not met. *Boomer Lake Park*, 4 F.3d at 1555; *Park County Resource Council, Inc. v. United States Dep't of Agriculture*, 817 F.2d 609, 621 (10th Cir.1987), *overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.) *cert. denied*, 506 U.S. 817, 113 S.Ct. 59, 121 L.Ed.2d 27 (1992). With these standards in mind, I turn to Plaintiffs' claims.

### IV.

#### Claim One—NEPA Violations

Plaintiffs claim that the DOE violated NEPA by granting WAI an easement access over the NWTC portion of the Buffer Zone without preparation of an EA or an EIS. DOE contends that the Easement was granted pursuant to a "categorical exclusion" to NEPA, thereby eliminating the need for an EA or an EIS.

#### A. NEPA

Congress enacted NEPA to ensure that all federal agencies consider the environmental impacts of their actions to prevent or eliminate damage to the environment. *See* 42 U.S.C. § 4331; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Sierra Club v. Hodel*, 848 F.2d 1068, 1088 (10th Cir.1988). NEPA "ensures that the agency will inform the public that it has indeed considered environ-mental concerns in its decision-making process." *Id.*

#### 1. Categorical Exclusion

Certain agency actions may be categorically excluded from full NEPA review. NEPA regulations define categorical exclusions as "actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4; 10 C.F.R. § 1021.410(a). A categorically excluded activity may nonetheless require full NEPA analysis if there are "extraordinary circumstances," such as when the action causes significant impacts. 40 C.F.R. § 1508.4; 10 C.F.R. §§ 1021.410(b)(2).

In determining whether an action requires an EA or EIS or is categorically excluded, federal agencies must not only review the direct impacts of the action, but also analyze indirect and cumulative impacts. *See* 40 C.F.R. §§ 1508.7,1508.8. In addition, NEPA regulations require agencies to consider the impacts of "connected actions." 40 C.F.R. § 1508.25(a)(1); 10 C.F.R. § 1021.410(b)(3).

In *Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir.2002), the Tenth Circuit set forth the standard for reviewing an agency's application of a categorical exclusion:

> Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision is arbitrary and capricious.... When reviewing an agency's interpretation and application of its categorical exclusions under the arbitrary and capricious standard, courts are deferential.

*Id.* at 1023.

Here, DOE relied on NEPA categorical exclusion A7 in determining that granting

the Easement did not require preparation of an EA or EIS. According to Plaintiffs, DOE's reliance on categorical exclusion A7 violated NEPA because: 1) categorical exclusion A7 does not apply to an easement for a mining road across the NWTC; 2) DOE arbitrarily limited its analysis to the Easement and failed to consider all environmental impacts including the impacts of the mine; and 3) the issuance of the Easement required an EA or EIS because the Easement and mine will cause significant environmental impacts.

a. Application of categorical exclusion A7

The use of categorical exclusion A7 is limited to DOE actions which transfer property where the use of that property is unchanged such that the type and magnitude of impacts would remain essentially unchanged. *See* 10 C.F.R. § 1021, Subparagraph D, App. A7. Thus, this exclusion applies only if the use of and impacts to the property remain unchanged upon the transfer.

■ According to Plaintiffs, DOE unlawfully relied on the A7 categorical exclusion because both the use of the NWTC land and the impacts to this parcel will change. In this area of the Buffer Zone, DOE studies and researches wind energy. There are no mining roads or other easements. Accordingly, granting the Easement authorizing the construction and use of a road that provides access to a mine site constitutes a new use of the property. Moreover, evidence demonstrates that the Easement will cause new and adverse impacts to the NWTC property. A road where none currently exists will affect the land differently. The new impacts include a paved road over undisturbed soils and grasses, truck traffic across the NWTC, and the use of pesticides to control vegetation during road construction. *See* NEPA Determination Request Form, AR Vol. 1,

§ B, Tab 6, pp. 2–3. In addition, the alignment of the road passes through an archeological site, traverses a tributary of Rock Creek, and may destroy habitat for wildlife. *See id.* Under these circumstances, the criteria for relying on categorical exclusion A7 for the Easement are not present because neither the use of the property nor the type and magnitude of impacts is unchanged. *See* 10 C.F.R. § 1021, Subparagraph D, App. A7. *See also High Sierra Hikers Ass'n v. Powell,* 150 F.Supp.2d 1023, 1044 (N.D.Cal.2001) (categorical exclusion applied unlawfully to renewal of long-term special-use permits for commercial pack trip operators in designated Wilderness Areas because it previously applied only to renewals of one-year or shorter permits).

An agency's interpretation of its own regulations must be rejected when "plainly erroneous or inconsistent with the regulation." *Mission Group Kan. v. Riley,* 146 F.3d 775, 780 (10th Cir.1998). DOE's application of categorical exclusion A7 to the Easement is inconsistent with a straightforward reading of 10 C.F.R. §§ 1021. There is no rational basis to conclude that constructing a private mining road on this land is the same land use as researching wind energy.

b. Sand and Gravel Mine Impacts

Under DOE's NEPA regulations, a categorical exclusion cannot be used if the proposed action is "connected to other actions with potentially significant impacts." 10 C.F.R. § 1021.410(b)(3). NEPA regulations define a connected action as one that "cannot or will not proceed unless other actions are taken previously or simultaneously." 40 C.F.R. § 1508.8(a)(1)(ii). Connected actions fall within one of three categories:

1. automatically trigger other actions which may require environmental impact statements;

2. cannot or will not proceed unless other actions are taken previously or simultaneously; or

3. are interdependent parts of a larger action and depend on larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

■ Pursuant to the these regulations, courts have held that approval of access roads across federal lands requires federal agencies to analyze impacts of the road as well as the activities for which the road is being constructed. *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985) ("the timber sales cannot proceed without the road"); *Save the Yaak Committee v. Block,* 840 F.2d 714, 720 (9th Cir.1988) ("road reconstruction, timber harvest, and feeder roads are all 'connected actions' that must be analyzed by the Forest Service in deciding whether to prepare an EIS or only an EA"); *Alpine Lakes Protection Society v. United States Forest Serv.,* 838 F.Supp. 478, 480–83 (W.D.Wash.1993) (Forest Service must consider not only access road across National Forest, but also logging on adjacent private lands). In these cases, the access roads had no independent purpose or utility distinguishable from the overall project. *See also Huntington v. Marsh,* 859 F.2d 1134, 1142 (2d Cir.1988), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) (Corps of Engineers could not review designation of waste disposal site without also taking into consideration agency's permits to dump dredged waste at site); *Port of Astoria v. Hodel,* 595 F.2d 467, 480 (9th Cir.1979).

In contrast, actions are not connected when the subject federal action has independent utility. For example, in *Airport Neighbors Alliance v. United States,* 90 F.3d 426, 431 (10th Cir.1996), the Court ruled the utility of a proposed runway improvement at Albuquerque's airport was distinguishable from the City's master plan for upgrading the entire airport and building adjacent commercial business parks. Similarly, in *Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1036–37 (10th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002), nationwide military flights were not related to the challenged Colorado Air National Guard training flights because the Air Guard flights had independent utility and were not dependent upon national military operations. Therefore, the action did not have to be analyzed in the same EIS. *Id.* at 1037.

Defendants rely on *Citizens' Comm. to Save Our Canyons v. United States Forest Serv.,* 297 F.3d 1012 (10th Cir.2002) in support of their position that the Easement and the mine are not connected actions. *Save Our Canyons* is factually distinguishable from the case here. In *Save Our Canyons,* the Court ruled that a land exchange and a master development plan for an existing private ski resort were not connected actions because the record indicated that the ski resort would have grown in accordance with the master development plan whether or not additional lands were acquired through the land exchange. *Id.* at 1023–24. Because the two actions were not dependent upon one another for their justification, the actions were not connected. *Id.* Thus, no NEPA analysis was required.

■ Here, in contrast, the Easement and the mine are connected actions because they are inextricably linked. *See Thomas,* 753 F.2d at 758–60; *Save the Yaak,* 840 F.2d at 720; *Alpine Lakes,* 838 F.Supp. at 480–83. But for the road, the mining company could not access the mine site; absent the mine, there is no independent utility for the access road. *See* Utility Right–of–Way Grant of Easement, AR

Vol. 1, § B, Tab 3, p. 1 (the mining road is "necessary to supply service to the Company's Installation"). *See also* MOU, AR Vol. 1, § B, Tab 2, p 3 ("an easement traversing the NWTC over which [the mining company may construct . . . a roadway connecting [ ] existing facilities to Highway 128")]. Under these circumstances, the Easement and the mine are connected actions. Therefore, DOE was required to consider and evaluate the mine's impacts on the environment. *See* 10 C.F.R. § 1021.410(b)(3).

c. Indirect and Cumulative Impacts

■ Plaintiff states that because NEPA requires federal agencies to consider the indirect and cumulative impacts of their actions, DOE must consider the impacts of the proposed expanded mining operation. I agree.

"Indirect effects" are defined as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. "Cumulative impacts" include impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* at § 1508.7. In accordance with these definitions, an agency "must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust v. FAA,* 290 F.3d 339, 342 (D.C.Cir.2002).

Plaintiffs contend that the indirect and cumulative effects of the Easement include the mine because the mine is a "reasonably foreseeable future action." The mining company has leased the subsurface estate mining right from a private party, developed a detailed mining plan for the mine site, AR Vol. 1, § A, Tab 20, acquired an easement for an access road, *id.* at § B, Tab 3, submitted an application to the County for rezoning, AR Vol. 1, § A, Tab 19, a special use permit, *id.* at Tab 21, and received County approval to mine 22 acres in the Buffer Zone. I conclude that these efforts by the mining company establish that the mine is a "reasonably foreseeable" future action.

Furthermore, as detailed above, the Easement is an integral part of the entire mining project. The fact that a private company will undertake the mining is irrelevant under NEPA regulations. *See* 40 C.F.R. § 1508.7 ("regardless of what agency or person undertakes such other actions"). It is also not pertinent when the mining company will begin operations, as long as action is "still reasonably foreseeable." *Id.* at § 1508.8. Whereas an oil and gas lease on public lands may or may not lead to the development of oil and gas reserves, *see Park County Resource Council,* 817 F.2d at 622, there are "firm plans" to develop the sand and gravel mine in the Buffer Zone. *See Davis v. Morton,* 469 F.2d 593 (10th Cir.1972) (concluding there were "firm plans" to build residential development on tribal lands). At the time the Easement was granted, the mine expansion was a reasonably foreseeable future action. Therefore, DOE was required to consider both actions in determining whether an EA or EIS were required under NEPA. DOE's failure to consider these actions was arbitrary and capricious.

d. Discretionary Control

■ According to Defendants, because DOE had no discretionary authority over mining in the Buffer Zone, NEPA does not apply to the mine and the A7 categorical exclusion was properly employed. *See* Resp. Brief, pp. 11–15, 17–18. I disagree.

DOE's actions with respect to mining activities in the Buffer Zone underscore the agency's discretionary authority. Until 1992, DOE excluded everyone from the

Buffer Zone. DOE and MRI acknowledge that DOE prohibited private interests from accessing their mineral rights throughout the Buffer Zone, including this 425–acre mine site. *See* DOE Resp. Brief at p. 5; MRI Resp. Brief, p. 2. In addition, DOE and WAI, MRI's predecessor, entered into an MOU in which DOE restricted and conditioned mining within the NWTC portion of the Buffer Zone. *See* MOU, ¶ IV, Mining Moratorium. AR Vol. I, § B, Tab 2. And, in a June 4, 1994 letter to WAI, DOE notes that it could "oppose actions by WAI [the mining company] that might result in an unreasonable use of the surface resources by WAI, in the interest of protecting surface resources." *See* AR Vol. II, § G, Tab 3. These documents demonstrate that DOE possessed some degree of discretionary power and control over the mining operations.

■ Furthermore, under Colorado state law, where interference with surface uses is "unreasonable from the perspective of the surface owner," the surface owner may require the mineral owner to use some reasonable alternative. *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 933–34 (Colo.1997). *See also Duncan Energy Co. v. United States Forest Serv.,* 109 F.3d 497, 498 (8th Cir.1997) ("federal law g[ives] the Forest Service the power to regulate Forest System lands and agreed with the Forest Service that it had the limited authority [based on state law] to determine the reasonable use of the federal surface"), *citing Duncan Energy Co. v. United States Forest Serv.,* 50 F.3d 584, 589–91 (8th Cir.1995). Thus, as a surface owner, DOE maintains some discretion to determine how, where, and when mining can occur and ensure that the surface use is reasonable. Armed with discretionary authority to determine reasonable use of the surface estate, which is a National Wildlife Refuge, DOE must comply with NEPA concerning the development of the mining operation.

e. Future NEPA Review

DOE contends that it will take a "hard look" at the environmental consequences of building the road and consider the significant aspects of the environmental impact of the road at the time the location of the road is known. Thus, according to DOE, its commitment to perform a NEPA review in the future obviates the need to perform a NEPA review at this time.

According to Defendants, a NEPA review undertaken at this time will be fraught with speculation and uncertainty. A NEPA review founded on hypothetical and theoretical assumptions does not meet the twin goals of NEPA and "would trivialize NEPA and would 'diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.'" *Park County Resource Council,* 817 F.2d at 623. Although Defendants' assurances of future NEPA review possess a certain pragmatic appeal, such assurances cannot obviate the need for compliance with NEPA regulations. Pursuant to 10 C.F.R. § 1021.410(b)(3), DOE's failure to consider and evaluate the mine's impacts on the environment at the time the Easement was issued was arbitrary and capricious. *See Friends of the Bow,* 124 F.3d at 1215.

V.

Violation of the Endangered Species Act

Plaintiffs claim that the DOE violated its ESA § 7 duty to consult with FWS on the environmental impacts of the Easement, including the proposed mining project, on the Mouse's habitat.

The standard for judicial review of agency action under the ESA is also provided by the APA. *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1401 (9th Cir.1995). When the agency has not acted, "the reviewing court shall compel agency action

unlawfully withheld" and set aside agency action "not otherwise in accordance with law." 5 U.S.C. § 706(1) & (2); *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1187–89 (10th Cir.1998).

## A. Law

The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA constitutes "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species ... [and] reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). To achieve its objectives, the ESA directs FWS to determine which species of plants and animals are "threatened" and "endangered" and place them on the endangered species list. 16 U.S.C. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range." *Id.* Upon listing, the ESA imposes a wide array of protections for the conservation of imperiled species.

Section 7 of the ESA requires federal agencies to "consult" with FWS for actions that "may affect" a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Federal agency actions include those projects "authorized, funded, or carried out by such agency." *Id.* The purpose of the consultation procedure is to ensure that federal agencies avoid "jeopardizing" listed species through their actions. 16 U.S.C. § 1536(a)(2). At the conclusion of consultation, FWS provides the action agency with a "biological opinion" that analyzes whether the action is likely to jeopardize the species continued existence. *Id.* at § 1536(b)(3)(A). If so, FWS suggests rea-sonable and prudent alternatives that could avoid jeopardizing the species. *Id.*

Similar to NEPA, the ESA and its implementing regulations require consultation on all "indirect" as well as "direct" impacts of a federal agency action. *See* 50 C.F.R. § 402.02. In addition, the analysis must include "effects of other activities that are interrelated or interdependent with" the agency's proposed action. *Id.* The consultation process must also consider the action's "cumulative effects," which are "are those effects of future State or private activities ... that are reasonably certain to occur within the action area." *Id.* An "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 10 C.F.R. § 402.02. "Effects of the action" means "direct and indirect effects of an action on the species or critical habitat together with the effects of other activities that are interrelated or interdependent with that action." *Id.* "Cumulative impacts" are those effects of future State or private activities ... that are "reasonably certain to occur within the action area." *Id.* Further, "interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

## B. Duty to Consult

Through the ESA § 7 consultation process, DOE may ensure that it does not take actions that may harm the Mouse, an ESA-listed species that lives in the wetland and riparian areas within Rock Creek. One of the reasons FWS listed the Mouse on May 13, 1998 was the threat of the 425–acre mine. As FWS stated, the mining project "can destroy and fragment [the Preble's meadow jumping mouse's] habi-

tat," "cause permanent changes" in the Rock Creek drainage, and destroy "gravel deposits that may provide key hibernation sites." *See* 63 Fed.Reg. at 26525.

Plaintiffs state that by granting the Easement over federal lands, DOE engaged in "agency action" within the meaning of ESA § 7. In addition, by granting the Easement, DOE "authorized" the mining company to use the Buffer Zone for a road to access the mine site. *See* 16 U.S.C. § 1536(a)(2).

In Plaintiffs' view, DOE's actions extend beyond the immediate scope of the Easement and, like the NEPA analysis, includes the mine as well. As the § 7 regulations provide, in addition to direct impacts of the action, agencies must consider indirect and cumulative impacts as well as "interrelated and interdependent actions." 50 C.F.R. § 402.2. Consequently, courts have required agencies to consider all related impacts. *Conner v. Burford,* 848 F.2d 1441, 1453–54 (9th Cir. 1988) (requiring ESA consultation to address not only oil and gas leases, but also future exploration and development); *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 128–130 (D.D.C.2001) (requiring ESA § 7 consultation analysis to include impacts of all activities within the action area that affect listed species); *Greenpeace v. National Marine Fisheries Serv.,* 80 F.Supp.2d 1137, 1149 (W.D.Wash.2000) (finding management plans unlawful for failing to consider cumulative impacts on the species).

■ The application of these regulations requires DOE to consult on the impacts of the mine and the Easement. As set out in my NEPA analysis, the mine and the Easement are "interrelated," or "connected" actions because the road has no purpose other than to provide access to the mine. The second element triggering the consultation duty is also present. Evidence confirms that one of the largest

remaining and significant populations of the Mouse occurs within the proposed mine site. Moreover, the mine could destroy the hydrological conditions that support the Mouse's wetland habitat. *See* 63 Fed.Reg. at 26525 (mining project "can destroy and fragment [the Preble's meadow jumping mouse's] habitat"). And, "[a]ny proposed activities on this site that would significantly alter the existing hydrology should be considered a serious threat to the survival of the [M]ouse." AR Vol. III, Tab 2. Thus, DOE's actions may affect the Mouse.

In opposition, Defendants cite specific substantive and procedural regulations providing that only after a species is listed as threatened or endangered, are protections accorded that species. *See* 16 U.S.C. §§ 1533, 1536, 1538, 1539. These ESA implementing regulations recognize that it would be illogical to require consultation where federal agencies lack the discretion to influence the results of their action, or to forego such action based on recommendations provided by the FWS through the consultation process. *See id.*

Defendants state that the Mouse was not subject to the protections of ESA when DOE granted the Easement in July 1995 because the Mouse was not listed as threatened until May 13, 1998, almost three years after the Easement was granted. Consequently, they argue DOE had no duty to consult with FWS with regard to the Mouse when the Easement was granted.

Because there was no consultation obligation when DOE granted the Easement, the issue then is whether DOE must consult with FWS now that the Mouse has been listed as threatened. Under specified circumstances, however, including the listing of a new species, ESA consultation regulations provide that an agency must revisit a past decision and initiate or reini-

tiate consultation if the agency retains "discretionary Federal involvement or control." 50 C.F.R. 402.16(d) (2002).

Although the Mouse was listed after the Easement was granted, DOE states that it is not required to revisit the granting of the Easement because it is not presently engaged in any discretionary action with respect to the Easement. *See e.g., Strahan v. Linnon,* 967 F.Supp. 581, 602 (D.Mass.1997) (Coast Guard's issuance of certificates of documentation to non-Coast Guard vessels was not discretionary, and thus, did not trigger ESA consultation requirement.). According to DOE, when, at some future date, any discretionary action is taken, it has agreed to consult with FWS with regard to any threatened or endangered species listed under the Endangered Species Act. According to Plaintiffs, however, the date FWS listed the Mouse is irrelevant for the purposes of § 7 consultation because consultation is a duty that continues for the duration of the agency action.

In *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court held that even though a federal agency had already approved a large dam project and implementation was well underway before the passage of the ESA and, therefore, before the listing of the endangered snail darter, § 7 still required the agency to consult. Similarly, in *Pacific Rivers Council v. Thomas,* 30 F.3d 1050 (9th Cir.1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995), the Northern Spotted Owl was listed after the Forest Service adopted a 15–year Forest Management Plan. Even so, the court required the Forest Service to engage in consultation because the Forest Plan was still in effect and rejected the agency's argument "that the ESA does not apply to programs or activities undertaken before the listing of a species." *Id.* at 1055.

■ Here, the Easement continues for a term of 99 years and is still in effect. Therefore, like the Forest Plan in *Pacific Rivers Council,* the Easement is a continuing agency action subject to § 7 compliance. Also, the mining company has rights to construct and use a mining access under the 1995 easement. And, DOE maintains some discretion over the Easement and the mine for as long as the Easement is in effect. Indeed, the Easement itself provides terms and conditions that DOE continues to oversee. *See* AR Vol. I, § B, Tab. 3, pp. 1–2. DOE may terminate the Easement under certain circumstances and will supervise construction and use of the mining road. *Id.* Furthermore, as set out in § 4(A)(1)(d), DOE maintains some discretionary control over mining activities in the Buffer Zone. Accordingly, the Easement is an agency action that is subject to § 7 consultation.

## VII.

### Conclusion

I conclude that the Department of Energy abused its discretion in failing to prepare an EA or EIS pursuant to NEPA prior to its decision to grant a road easement by:

1. failing to take a "hard look" at the significant impact the Easement and the mine would have on the environment; and

2. erroneously granting a categorical exclusion:

   a. because there was a change in use of the land;

   b. by failing to discuss or evaluate the mine's environmental impact;

   c. because the granting of the Easement is connected to other actions with potentially significant impacts; and

   d. by failing to consider the indirect and cumulative impacts of the Easement.

I conclude further that the Department of Energy violated its ESA § 7 continuing duty to consult with the Fish and Wildlife Service on the environmental impacts of the Easement, including the proposed mining project, on the Preble's jumping mouse's habitat.

Accordingly, IT IS DECLARED that:

1. the Department of Energy violated the requirements of the National Environmental Policy Act and Endangered Species Act upon granting a road easement at Rocky Flats;

2. the Department of Energy's road easement is VOID for violating the National Environmental Policy Act and Endangered Species Act.

Furthermore, IT IS ORDERED that:

3. the Department of Energy SHALL VOID the road easement issued to the mining company;

4. the Department of Energy SHALL COMPLY with the National Environmental Policy Act and Endangered Species Act in connection with any future road easement and the proposed sand and gravel mine at Rocky Flats; and

5. upon filing of a bill of costs within 10 days from the date this Order enters, Plaintiffs are awarded costs and attorney fees.